Gregory J. MARVIN, Plaintiff,

v.

Michael KING, et al., Defendants.

No. IP86–1096–C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

March 28, 1990.

Scott E. Shockley, Muncie, Ind., for plaintiff.

William W. Kurnik, Stephenson & Kurnik, Indianapolis, Ind., for defendant King.

## DECISION ON MERITS AFTER BENCH TRIAL

McKINNEY, District Judge.

This § 1983 employment action comes before the Court for a decision on the merits after a bench trial. As shown below, the issues raised are subtle but complex, and the Court's prior rulings on summary judgment require reexamination in light of the discovery that the Court previously relied on an inapplicable statute. Today's opinion thus requires a rather lengthy discussion in order to address all the issues.

After considering the law and the evidence, and for the reasons set forth below, the Court FINDS IN FAVOR of the plaintiff on the due process claim, REINSTATES the plaintiff's First Amendment claim, and sets this matter down for further briefing as to damages.

## I. FINDINGS OF FACT:[1]

Plaintiff Marvin King, a life-long Muncie resident, became interested in joining the Muncie Fire Department many years ago as a result of his uncle's position with the Department. In 1983, while Marvin was working as a painter and earning a modest paycheck, he applied to the Muncie Police and Fire Merit Commission for appointment to the Muncie Fire Department. He then began the lengthy application process set forth under *Ind. Code* § 19–1–14–9, *et seq.*, and the Merit Commission's regulations thereunder.

Marvin was given various physical and mental tests and submitted proof of his satisfactory physical condition. He received 60 hours of intensive training in fire fighting, which included entering a burning building, and he satisfactorily passed his training school. He also studied for and passed a written test. His scores from his personal interview, written examination, and training school were then combined. Based on this composite score, Marvin was then placed on a ranked eligibility list from which appointments were made as vacancies occurred.

In late 1984, the Fire Department had two vacancies. On January 3, 1985, Gregory Marvin was selected to fill one of them by the Muncie Police and Fire Merit Commission. The minutes of the Merit Commission's meeting describe this action as follows:

A motion was made by Koor, second by Holland to appoint Gregory Marvin to the Muncie Fire Department subject to approval by the Muncie Fire Pension Board. Roll call: 4 yeas, 0 nays.

Marvin was present at this meeting of the Merit Commission.

---

1. The findings in this case are based upon the testimony of the plaintiff's seven witnesses, the defendant's four witnesses, the fifteen exhibits introduced at trial, and several exhibits that were previously introduced into the record at summary judgment.

After the meeting, Marvin celebrated at a local establishment and was congratulated by his friends and some of the Department's firefighters. At that point Marvin believed that he could only be discharged for physical or mental problems, or for cause shown.

At the direction of the Merit Commission, Marvin then underwent a physical exam and mental evaluation several weeks later in order to gain acceptance into the 1977 Police Officers' and Firefighters' Pension and Disability Fund. Membership in this Fund is governed by the Muncie Firemen's Pension Fund Board, subject to some oversight by the State Pension Fund Board. The State Board, in consultation with the commissioner of mental health, was required by statute to have selected a mental examination to be used by the local boards. The mental exam is "to determine if the ... firefighter is mentally suitable to be a member of the department." *Ind. Code* § 36–8–8–19(b). The local board is to then select a community mental health center, a hospital, a licensed physician, or a licensed psychologist to administer the examination. *Id.*

The Muncie Pension Board's own By–Laws further speak to these exams:

Applicants who fail to meet the physical, psychological, or mental requirements of the Board of Trustees or who shall fail or refuse to fill out the blanks made and provided therefore, or shall fail or refuse to be examined by the physician selected by the Board of Trustees such applicants shall be rejected and disqualified as a member of the Muncie Police Force. (sic).

The By–Laws also provide that it is the "duty of the Pension Fund Medical Examiner to instruct future applicants to the Muncie Firemen's Pension Fund to undergo further psychiatric examination whenever abnormal mental reaction is found during the examination of the said applicant."

Marvin passed his physical exam without incident. The mental testing was performed by Marilyn Nathan, whose licensing was inadequate under state law as she held only a school psychologist's license. No mental examination was ever developed by the State Pension Fund Board, so Nathan did not have prescribed standards to follow. Instead, Nathan merely had the general comments of Fire Chief Michael King, who informally told her what the Board's general interests were in this regard.

Nathan evaluated Gregory Marvin by conducting seven different tests over a three to four hour span. She then wrote a four-page "Psychological Report" and delivered it to the Pension Board. This report did not state affirmatively that Marvin should or should not be accepted into the Pension Fund. The report did note that Marvin failed to respond to some projective stimuli, that some of his responses indicated feelings of anxiety and depressive tendencies, and the report hypothesized that he had possible inadequate adjustment and problems with ego functioning. Nathan later met with the Pension Board to explain her report, but again did not definitively state whether Marvin was mentally suitable for admission to the Fund.

The Board, composed entirely of lay individuals, relying solely on Nathan's report, and lacking any standards, voted to deny Marvin admission to the Fund without holding a hearing at which Marvin could attend. Michael King, the fire chief and a member of the Board, wrote a one paragraph letter to Marvin informing him of the decision. The letter stated,

After reviewing all the data required by the Muncie Fire Department for employment to said department, the Muncie Fire Pension Board has concluded that, at this time, we feel it would not be in your best interest nor in the best interest of the Department to approve your application for membership into the 1977 Fire and Police Pension Acts.

Marvin was humiliated by the action, and it has weighed on his mind heavily since that time. Marvin sought out the advice of legal counsel, and a request was made for reconsideration of the Board's decision. Counsel asked for the opportunity to cross examine Ms. Nathan and to present the testimony of Dr. Krause, a fully licensed psychologist.

On May 7, 1985, a reconsideration hearing was held. The plaintiff, his counsel, and Dr. Krause were present and available for questioning by the Board. Dr. Krause gave his opinion that Marvin was suited for acceptance into the Fund. Ms. Nathan was not present and was never made available for cross examination. Thereafter on May 15, 1985, the Board declined the opportunity to set aside its earlier decision, apparently rejecting the testimony of Dr. Krause and again relying on Ms. Nathan's report.

The Pension Board's By–Laws required the mental exams to be done by a licensed physician, and required a second opinion in the event of an "abnormal reaction" on the exam. The By–Laws also called for a hearing on the application for entry into the Pension Fund. No such hearing was held nor was a second opinion sought after Marvin received the unsatisfactory report on his mental exam.

In the interim, Marvin had lost his job at the painting company and had begun receiving unemployment compensation. He searched diligently for other work, and eventually found a position with the Indiana Department of Transportation. He still works for the Department of Transportation today.

If Marvin had been accepted into the Fire Department back in 1985, he would have earned substantially more over the past five years than he actually did in his other employment. His total back pay, including interest, for the past five years would have been $55,690.68. During that same time, the City of Muncie would have contributed a net total of $19,232.69 to his pension fund.

Plaintiff brought this action under 42 U.S.C. § 1983 seeking to recover damages for an alleged deprivation of property rights in his continued employment with the Fire Department, and for being rejected into the Fund in retaliation for his political persuasion. Through a series of rulings, the issues had been narrowed to whether plaintiff had a property interest by virtue of a mutually explicit understanding, and, if so, what damages plaintiff is entitled to receive. As discussed below, however, some aspects of the previous rulings must be reconsidered at this juncture.

## II. DISCUSSION

### A. Liability Under § 1983:

The basic standards governing § 1983 cases are well settled. "In any § 1983 action, the plaintiff must prove two essential elements: (1) that 'the conduct complained of was committed by a person acting under color of state law'; and (2) that 'this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.'" *Polenz v. Parrott*, 883 F.2d 551, 555 (7th Cir.1989) (*quoting Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)). The defendants do not dispute that they were acting under color of state law, so the only issue is whether the second element of a § 1983 action is satisfied.

In this case, plaintiff bases his Complaint on an alleged denial of due process rights and an infringement of his First Amendment rights. The Court will first address the due process issues. Then, notwithstanding that the Court previously rejected the First Amendment claim at summary judgment, the Court will reconsider that issue as well.

#### 1. *Due Process Issues:*
##### a. General Standards

To prevail on his due process claim, the plaintiff must demonstrate: (1) that the claimed interest is a protected property interest under the Fourteenth Amendment; (2) that the alleged loss amounts to a deprivation; and, (3) that the deprivation was without due process of law. *Polenz*, 883 F.2d at 555; *Thornton v. Barnes*, 890 F.2d 1380, 1386 (7th Cir.1989) (in § 1983 employment case, the plaintiff must demonstrate a protectible property interest in his employment). In this case, because there was clearly a deprivation and the process granted was unsatisfactory, the only question is

whether plaintiff had a protected property interest in his job.[2]

"Ever since *Board of Regents v. Roth*, [408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)], the basic criteria for the recognition of a property interest have been well established[.]" *Thornton v. Barnes*, 890 F.2d at 1386. "Property interests are not created by the Constitution but are 'defined by existing rules or understandings that stem from an independent source such as state law' and arise only where the plaintiff demonstrates a 'legitimate claim of entitlement.'" *Polenz v. Parrott*, 883 F.2d 551, 555 (7th Cir.1989) (*quoting Board of Regents v. Roth*, 408 U.S. at 577, 92 S.Ct. at 2709). "Therefore, property interests in employment may be created by express or implied contracts, municipal ordinances[,] or state laws—including those 'rules or understandings that secure benefits and that support claims of entitlement to those benefits.'" *Thornton*, 890 F.2d at 1386. (*quoting Farmer v. Lane*, 864 F.2d 473, 478 (7th Cir.1988)).

As the Seventh Circuit recently stated, To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

*Wolf v. Larson*, 897 F.2d 1409, 1411 (7th Cir.1990) (*quoting Board of Regents v. Roth*, 408 U.S. at 577, 92 S.Ct. at 2709).

The state law or ordinance relied upon, however, must provide more than procedure, for there "is neither a 'liberty' nor a 'property interest' in procedures themselves...." *Fleury v. Clayton*, 847 F.2d 1229, 1231 (7th Cir.1988). As the Seventh Circuit has written, "In order to give rise to a constitutionally-protected property interest, a statute or ordinance must go beyond mere procedural guarantees to provide some substantive criteria limiting the state's discretion—as can be found, for example, in a requirement that employees be fired only 'for cause.'" *Cain v. Larson*, 879 F.2d 1424, 1426 (7th Cir.1989), *cert. denied*, — U.S. ——, 110 S.Ct. 540, 107 L.Ed.2d 537. "If a statute or regulation merely delimits what procedures must be followed before an employee is fired, then it does not contain the requisite substantive procedure." *Id.*

■ In this case, then, Marvin's property interest cannot be based solely upon the various statutes and rules that require certain procedures to be followed in the Pension Board's mental examination, nor upon the Merit Commission's obligation to hold a hearing for probationers who are found to lack the capacity to serve. Rather, any property interest here must come from a statute, rule, or mutually explicit understanding that provides some substantive criteria limiting the state actors' discretion.

### b. The "Home–Rule" Matter

Although the Court previously ruled at summary judgment that the relevant stat-

---

**2.** In ruling on a previous summary judgment motion, the Court held as a matter of law that plaintiff did not receive due process. It should be noted that if this issue had not been disposed of by summary judgment, the Court would have made the same finding at this stage.

In particular, no standards were ever adopted for evaluating mental exams, the individual who examined Nathan was not qualified to do the exam under the governing statute, Marvin was not afforded a hearing by the Pension Fund Board prior to initially being rejected for membership in the Fund, and he was not given the opportunity to cross examine Ms. Nathan at the reconsideration hearing. Nor did the Board

follow its own By–Laws and have the medical examiner "instruct [the] applicant[ ] to ... undergo further psychiatric examination whenever abnormal mental reaction is found during the examination of the ... applicant."

It should also be noted here that *Ind.Code* § 19–1–14–20 states that probationary members of the fire department shall have the right to a hearing if their "conduct or capacity ... is found not to be satisfactory...." Thus, if Marvin was a probationary employee, which is discussed later in this opinion, Marvin was also entitled to a hearing before the Merit Commission under Title 19 after it was determined that his "capacity" to serve was not satisfactory.

utes and rules could not provide the property interest in this case, that conclusion must be reexamined in light of the discovery that the Court relied on an inapplicable statute in part of its summary judgment analysis. Specifically, in the prior opinion the Court applied *Ind. Code* § 36–8–3.5–1, *et seq.*, in addressing the law which the Merit Commission must follow. However, Title 19, rather than Title 36, governs the Muncie Merit Commission because Muncie specifically decided to follow "home-rule."

The Muncie Merit Commission was originally governed by *Ind. Code* § 19–1–14–1, *et seq.* In the early 1980s the Indiana General Assembly enacted a new law for municipal police and fire department merit systems, and that new statute was codified in Title 36 at *Ind. Code* § 36–8–3.5–1, *et seq.* However, as part of the new law, the General Assembly specifically provided that if a city already had a merit system in place under Title 19, that city could opt to remain governed by Title 19 via "home-rule." *See Ind. Code* § 36–8–3.5–1.

In December of 1982, the Common Council of Muncie passed an ordinance opting to remain governed by Title 19, and the home-rule ordinance was signed by the Mayor and passed into law. Accordingly, at all times relevant to this case, the Muncie Police and Fire Merit Commission has been governed by Title 19, not Title 36. Because there are significant differences in the two statutory schemes,[3] the Court must start from scratch in determining whether plaintiff has a property interest under Title 19, any of the applicable rules or regulations, or under a legitimate understanding.

█ It should be noted that the Court has the power to reconsider its summary judgment ruling as no final judgment was entered at that point. Indeed, even when judgment is entered, the district courts have the power to order a new trial on their own initiative within ten days of entry of a Rule 54 judgment. *See* Fed.R.Civ.P. 58, 59(d). Although the Court does not set aside the law of the case lightly, it must do so where, as here, it is apparent that a prior ruling requires reconsideration and the Court still has jurisdiction to do so. *Cf., Remington Products, Inc. v. North American Philips Corp.*, 1989–2 Trade Cas. (CCH) 68,755, 1989 WL 118787, 1989 U.S.Dist.LEXIS 7877 (D.Conn. July 10, 1989) (during pendency of case, district court sets aside its grant of summary judgment made several months earlier where applicable law changed).

### c. Analysis of the Merit Commission Statute

In order to determine whether Marvin had a property interest, it is necessary to evaluate what "legitimate claim of entitlement" he might have had. The question is whether he had a legitimate claim of entitlement to his status as an individual who had made it through screening, satisfactorily passed the exams and training, made it on to the eligibility list, and been selected from that eligibility list to be a member of the fire department. The initial focus in this setting must be on the governing statutory provisions themselves rather than any regulations or mutually explicit understandings, for the governing state statutes are supreme.

As noted, the Muncie Police and Fire Merit Commission was created pursuant to *Ind. Code* § 19–1–14–1, *et seq.*[4] The Merit Commission's actions in the "selection, training, appointment, promotion, demotion, suspension, disciplinary actions and dismissal of all persons employed or to be employed … by the fire department" are

---

**3.** For instance, Section 12(h) of the Title 36 provision, speaking to the rights of probationers, provides that if "a member is notified that he will not receive a permanent appointment, his employment immediately ceases." *See Ind. Code* § 36–8–3.5–12. The provisions of Title 19, however, contain no such automatic cessation clause. Instead, the comparable provision of Title 19 provides that probationers have a right to a hearing if it is determined that their conduct or capacity is not satisfactory. *See Ind. Code* § 19–1–14–20.

**4.** Title 19 has been removed from the statutory compilations, even though portions of it remain applicable to home-rule cities. The relevant provisions of Title 19 are contained in Exhibit C in this case.

governed by this statutory scheme. *Ind. Code* § 19-1-14-3. One of the Commission's objectives, by statute, is to improve the "morale and efficiency of police and fire department personnel through the adoption of objective standards for employment and promotion." *Ind. Code* § 19-1-14-5. "Such standards should emphasize experience, training, personal aptitudes and abilities rather than political affiliation." *Id.*

The mandatory structure of the hiring process is specifically set forth in the governing statute, and an individual's path through this process can be broken down into five stages: (1) applicants; (2) preappointive personnel or trainees; (3) candidates for appointment; (4) probationers or probationary appointees; and (5) final and permanent appointees. This structure is illustrated in the outline set discussed below.

The first step in the process is the "applicant" stage, as set forth in sections 9 and 10 of Chapter 14. The following summary depicts this stage:

(1) **"Applicant"**—The statute provides that all persons seeking to become members of the fire department "shall become applicants for training and shall meet the requirements set forth in this section." *Ind. Code* § 19-1-14-9. These applicants are required to "submit to such initial screening interviews as the commission may determine." *Ind. Code* § 19-1-14-10. At this stage, the Commission "is empowered to reject an applicant who, in the judgment of the commission, does not possess the qualifications to undertake training." *Id.*

After passing the initial screening, applicants must furnish a birth certificate and "a physician's report certifying to their general good health and physical status," and both at the applicant's own expense. *Ind. Code* § 19-1-14-9. Applicants must also pass all examinations and tests as the commission shall provide. *Ind. Code* § 19-1-14-10(b).

Upon passing the applicant stage, the next step is the "preappointive personnel" or "trainee" stage, as set forth in section 11 of Chapter 14 and summarized below:

(2) **"Preappointive personnel" or "trainees"**—The statute next provides that the commission shall arrange for a school of training and instruction for "preappointive personnel." *Ind. Code* § 19-1-14-11. Applicants are chosen by the commission to attend the school. The commission is to establish minimum standards to determine the fitness of any individual to continue in the training program, and these "trainees" are required to maintain ratings above those minimums throughout the training program.

The statute specifically states that a trainee attending preappointive training school "shall not be considered an employee of the city and shall not be entitled to renumeration from the city, nor shall the city be liable for any damage or personal injury sustained by a trainee while attending classes or engaged in training exercises." *Ind. Code* § 19-1-14-11.

Thus, trainees undertake training school on their own time, without pay, and without any chance of recovery from the city should they become injured during training.

The third stage of the process begins upon successful completion of training school, after which the individual is a "candidate for appointment." This stage is set forth in section 12 of Chapter 14, as summarized below:

(3) **"Candidate for appointment"**—The statute next provides that "[u]pon successful completion of the training school, the names of the candidates for appointment to the ... fire department shall be placed on an appointment eligibility list and certified by the merit commission." *Ind. Code* § 19-1-14-12.

■ The fourth stage begins when a vacancy occurs in the department and the fire chief requests the commission to fill the spot with a probationary appointee, as set forth in sections 12 and 20 of Chapter 14 and summarized below:

(4) **"Probationer" or "Probationary appointee"**—The statutory scheme next

provides that upon written request by the fire chief, the commission "shall appoint persons from the top three candidates on the eligibility list of the respective departments to fill any existing vacancy...." *Ind. Code* § 19–1–14–12.

These individuals are then considered probationary appointees under *Indiana Code* § 19–1–14–20 for a probationary period of one year of actual service. During this probationary period, if the "conduct or capacity of the probationer is found not to be satisfactory, which fact shall be determined by the commission, the probationer shall have the right of hearing without the right of appeal...."

Thus, during the probationary period, if the commission makes the finding that the probationer's conduct or capacity is not satisfactory, the probationer must be afforded a hearing to contest the action.

Finally, the fifth step is "final and permanent appointment," which occurs automatically under *Ind. Code* § 19–1–14–20 by the retention of the probationer in the department after the end of his probationary period. Final and permanent appointees can only be dismissed, suspended, or punished for cause. *Ind. Code* § 19–1–14–19.

The present inquiry, then, notwithstanding for the moment any Merit Commission regulations or Pension Board statutes or regulations, is whether the statutes governing the Merit Commission provide the basis for a property interest in this case. Several initial observations can be stated without difficulty.

First, at stage 1 when the individual is a mere "applicant," that person has no property interest whatsoever. The statute itself states that the Commission may reject an application if, in the judgment of the Commission, the applicant does not possess the qualifications to undertake training. Second, at stage 2 when the individual is among the "preappointive personnel" or "trainees," he also probably lacks any property interest as the statute specifically states that he is not an employee. It is possible, however, that a property interest might exist if a trainee is terminated from the program when his ratings exceed the minimums proscribed by the Commission, for those ratings would impose a standard on the exercise of the Commission's discretion. Third, it is undisputable that the stage 5 "final and permanent appointee" has a property interest in his continued employment because the statute provides that a member of the department can only be dismissed for cause.

In this case, however, Gregory Marvin was clearly a stage 4 "probationer" under the statutory scheme governing the Merit Commission. Pursuant to the statute, Marvin had passed the first three stages satisfactorily, had been placed on the eligibility list, and had been selected by the Commission to fill a vacancy. By law, the Commission was required to fill that vacancy upon request by the fire chief by appointing someone from the top three of the eligibility list. *Ind. Code* § 19–1–14–12. And, by law, Marvin then became a probationer. *Ind. Code* § 19–1–14–20. Under the Title 19 statutes which specifically govern the hiring of fire department employees in Muncie and which are supreme to any subordinate and conflicting regulations, nothing else remained to be done for Marvin to become a probationary employee.

Indeed, Indiana case law holds that the appointing body does not have discretion to refuse to appoint an individual who has been certified as highest on the eligibility list. *Pastrick v. Armenta,* 438 N.E.2d 762 (Ind.App.1982) (under similar statutes, board of public safety of East Chicago did not have discretion to refuse to appoint individual who was highest on eligibility list). As the Indiana Court of Appeals noted in *Pastrick,*

It is, we think, the clear mandate of the legislative scheme that to promote equal opportunity based upon merit those persons appropriately certified as qualified must be given the opportunity to demonstrate their ability to perform the duties and carry out the obligations of the office. If they fail in this opportunity they may be terminated by appropriate action.

*Pastrick,* 438 N.E.2d at 766. Thus, Gregory Marvin, being in the top three of the

**354**

eligibility list and being selected by the Commission, was required to be appointed at that time.

The question in this case is thus whether a stage 4 "probationer" has a property interest. While it is at least plausible that a stage 3 candidate for appointment has such an interest, *Cf., Petru v. City of Berwyn*, 872 F.2d 1359, 1363–65 (7th Cir. 1989) (no property interest under Illinois' firefighter eligibility statute because statute did not require an appointment to be made at any particular time), it seems certain that a stage 4 probationer has a legitimate claim of entitlement to his position. This is so because the probationer has jumped through a number of difficult hoops to get where he is, and in recognition of this, the legislature has provided that his position cannot be altered with unfettered discretion.

After going through initial screenings and providing medical evidence at his own expense, Marvin spent the equivalent of seven work days going through challenging and dangerous fire fighting training, and all without pay or the possibility of recovering from the city if he were injured. Marvin completed this training satisfactorily, and then studied for and passed a written exam. He was then rated and placed on the eligibility list, waiting only for a vacancy so that he could be appointed. He was then appointed by the Commission.

At this stage, as noted above, he was a probationary employee. He had a reasonable expectation, based on the governing Indiana statute, that his probationary status would not be altered unless his "conduct or capacity" was found "not to be satisfactory." *Ind.Code* § 19–1–14–20. This statutory provision imposed a substantive standard upon the Commission as to when and why it could alter Marvin's status.

As the Seventh Circuit has stated, "[A] statute or ordinance must go beyond mere procedural guarantees to provide some substantive criteria limiting the state's discretion—as can be found, for example, in a requirement that employees be fired only 'for cause.'" *Cain v. Larson*, 879 F.2d 1424, 1426 (7th Cir.1989). The limitation on the Commission's discretion contained in *Ind.Code* § 19–1–14–20 is precisely the type of limit on discretion that provides the basis for a property interest.

Defendants argue that only limitations for cause, such as those found in *Ind.Code* § 19–1–14–19, can create property interests. However, assuming arguendo at this juncture that the "cause" limitations of section 19 that apply to "members of the fire department" are not invoked here, the "unsatisfactory" standard of section 20 that is undisputably applicable to probationers serves much the same purpose as a "cause" standard.

Indeed, if something is "satisfactory," it "reliev[es] the mind from doubt or uncertainty." *Websters Encyclopedic Dictionary* 746 (1972). In the context of the Commission's statutory mission to "adopt objective standards for employment" emphasizing "personal aptitudes and abilities," *Ind.Code* § 19–1–14–5, the meaning of "satisfactory" conduct or capacity is clear. The Commission can only find that a probationer's conduct or capacity is unsatisfactory if the probationer's aptitudes or abilities leave the Commission doubtful of the probationer's ability to be a member of the fire department.

With this background, it is seen that the statute's use of a "satisfactory" standard is very similar to one for cause. Clearly, under either an individual's status cannot be altered because of something that does not reasonably relate to the functioning of the fire department. For instance, the Commission could not discharge a probationer or a permanent fire fighter because of, say, the color of his eyes, his interest in reading Mad magazine, his backing of the Chicago Cubs, or any other arbitrary matter upon which employers of at-will employees are free to base their employment decisions. Instead, just as with the "for cause" limitation, the "satisfactory" standard limits the discretion of the Commission and imposes a significant substantive element into their decisions.

Thus, there is nothing magical in property interest analysis about a "for cause" statute. Rather, the "for cause"

standard is just one type of substantive limit that the legislature can place upon the Commission's exercise of discretion. The "satisfactory" standard similarly restricts the Commission's exercise of discretion, and is a sufficient foundation upon which to base a property interest.[5]

The case law in this area supports the conclusion that probationers have a property interest when a statute or regulation substantively limits the state's discretion in altering their probationary status. Although many courts have made general statements indicating that there are "no due process rights to probationary employees," *Fong v. Purdue University*, 692 F.Supp. 930, 947 (N.D.Ind.1988), and while other courts have squarely held that, in a given case, probationers lacked property

---

**5.** Thus, the issue of whether the "for cause" standard of *Ind.Code* § 19-1-14-19 applies to probationers is not outcome determinative. The Court notes, though, that under the statutory scheme of Chapter 14, this for cause limitation might well apply to dismissals, suspensions, and punishments of probationers.

The language of *Ind.Code* § 19-1-14-19 provides that the chief "may impose reprimands and suspensions from duty without pay for a period not exceeding ten days." This section then provides that "[a]ll other dismissals, suspensions and punishments of members of the ... fire department shall be by the commission and shall be for cause...." In section 20 of the Chapter, the statute provides that if the Commission finds that the probationer's conduct or capacity is found not to be satisfactory, the probationer shall have the right of hearing without the right of appeal. *Ind.Code* § 19-1-14-20.

A close reading of these two sections thus reveals that section 20 does not expressly speak of dismissal or termination of probationers. Rather, it merely states that if, during the probationary period, the badge of "unsatisfactory" is placed upon the probationer's record, the probationer has an opportunity to cure that action via a one-shot hearing. Thus, nothing in section 20 specifically mentions that the section is meant to deal with the termination of probationary employment. To the contrary, this section can be fairly read, and would be so read by strict constructionists, as merely affording the probationer a procedure to keep his record clean during the first year.

Section 19, however, does specifically address dismissals and suspensions. The first clause of section 19 gives the fire chief broad powers to impose temporary suspensions for up to ten days without any approval of the Commission and with no right of review. This clause does *not* state to whom it applies. Thus, a reasonable interpretation is that this clause applies to all firefighters, probationers and permanent employees alike. Indeed, one can easily imagine the fire chief taking the position that he has the power to temporarily suspend a probationer. True, the probationer might then be afforded rights under section 20, but section 19 appears to give the chief the power to make discretionary temporary decisions such as this.

The second clause of section 19 then states that "all other" dismissals, suspensions, and punishments of "members" shall be made by the commission and shall be for cause. The question then becomes whether the punishment or termination of a "probationer" falls within this "all other" category, and whether a probationer is a "member" of the fire department.

The term "member" is not defined by the statute, so it must be given its plain and ordinary meaning. "Member" is defined in the dictionary as "part of an aggregate or a whole; one of the persons composing a society, community, or the like." *Webster's Encyclopedic Dictionary* 527 (1972). A probationer is "one who is on probation or trial," and probation is defined as "any proceeding designed to ascertain character, qualifications, or the like; a preliminary or prepatory trial or examination." *Id.* at 662.

The question is thus a close one, and there is apparent ambiguity in the statute. On the one hand, section 20 speaking to probationers can be read as not applying to terminations and punishment, thus suggesting that section 19 does apply. Moreover, the first clause of section 19 does seem broad enough to cover probationers. On the other hand, the use of the term "member" in the second clause of section 19 can be read as excluding a probationer who is still "on trial" and not finally and permanently appointed. Alternatively, a probationer could reasonably be considered a "part or aggregate" of the fire department.

Thus, if this issue needed to be decided, the Court would go beyond the language of the statute to discover the legislative intent. Unfortunately, there is no legislative history available. However, the Court notes that Rule 6 of the Merit Commission's Rules tracks the language of section 19 and requires cause for dismissal and punishment. The Rule, however, is slightly broader than the statute in that it initially states that the Commission may take disciplinary action against "any firefighter" under Rule 6. Moreover, the Court has been presented with evidence of the drafter's intent from several of the Commission members who were involved in passing Rule 6. These Commissioners unequivocally state that they intended Rule 6's "for cause" standard to apply to probationers.

Thus, even if the statutory "for cause" language of section 19 does not, in fact, apply to probationers, the "for cause" language of Merit Commission Rule 6 does. As noted previously, however, the "satisfactory" standard of section 20 is enough to give rise to a property interest.

interests, *see, e.g., Evans v. City of Dallas,* 861 F.2d 846, 849–50 (5th Cir.1988), it must be remembered that in these settings, property interests depend on state law. *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. Thus, such statements and holdings are, by definition, limited to the applicable state statutory schemes at issue in each case.

As the Ninth Circuit emphasized in a recent opinion, "Under [local] law, a probationary civil service employee *ordinarily* has no property interest in continued public employment and may be dismissed without good cause." *McGraw v. City of Huntington Beach,* 882 F.2d 384, 389 (9th Cir.1989) (emphasis in original). Thus, just because the states typically do not limit the reasons for which a probationary employee may be dismissed, this does *not* mean that the states lack the power to do so. Indeed, there are many cases recognizing that probationary employees may have a property interest in their continued status.

For instance, in *Farmer v. Lane,* 864 F.2d 473 (7th Cir.1988), the Seventh Circuit acknowledged that Illinois state appellate courts have found a property interest for probationary employees where a statute or regulation "resembling the 'for cause' " standard substantively limits the exercise of discretion. *Id.* at 479–89, *citing Lewis v. Hayes,* 152 Ill.App.3d 1020, 106 Ill.Dec. 102, 505 N.E.2d 408 (1987) (Illinois Court of Appeals holds that probationer has property interest where city rules state he can be terminated "if he is found incompetent or disqualified"). Although the *Farmer* court did not find a property interest in that particular case because no such substantive limit was present in the governing state statutes or regulations, the opinion is important in that it contains a specific discussion of when a probationer can obtain a property interest.

In ruling that no property interest existed where the applicable regulations merely required an evaluation to be performed, the Seventh Circuit focused on the fact that such evaluations, even though mandatory, did not impose a substantive standard on the decision-maker. The *Farmer* court emphasized that a "substantive requirement

*resembling the 'for cause' " standard* is necessary, and that mere procedural protections are not enough. *Farmer,* 864 F.2d at 480 (emphasis added). Thus, "for cause" is not the magical standard; there must merely be some standard resembling this, and it must be one that places a substantive limit on the employer's discretion. *Cf., McGraw v. City of Huntington Beach,* 882 F.2d 384 (9th Cir.1989) (court implies that a probationer who can establish rules or understandings that justify a legitimate claim to continued employment absent sufficient cause has a property interest).

A prime example of how a probationer can attain a property interest is illustrated in *Perri v. Aytch,* 724 F.2d 362 (3d Cir. 1983). There, the Third Circuit squarely held that where a state regulation limits dismissals during probation to those for cause, probationary employees have a protected property interest.

In *Perri,* the plaintiff was hired as a typist for the court of common pleas and was placed on six months probationary status. The regulations governing her employment provided that she could be discharged "for just cause only." After working for ten weeks, the plaintiff was arrested and charged with possession of drugs. Shortly thereafter she was given a "satisfactory" evaluation for her first two months of service. The drug charges were dismissed several months later. However, near the end of her six month period she was discharged by way of a written letter, and was not afforded any pre-deprivation hearing. *Perri,* 724 F.2d at 363–64.

The plaintiff filed a § 1983 due process action in federal court, but her claims were rejected at summary judgment by the district court. On appeal, the Third Circuit reversed, holding that a property interest existed. The *Perri* court explained its decision, writing,

On its face, these regulations inexplicably appear to guarantee that a probationary employee, just as a permanent employee, will not be terminated except for just cause. The employer's regulations thereby grant an employee an expectation interest in continued employment

during the six-month probationary period. Although the court of common pleas could have elected not to confer a property interest [in enacting its regulations], having conferred it, it may not deprive [its employees] of their interest without appropriate procedural safeguards.

*Perri*, 724 F.2d at 366. *See also, Town of Speedway v. Harris*, 346 N.E.2d 646 (Ind. App.1976) (Indiana Court of Appeals rules that probationary firefighter had protected property interest because regulation stated that any individual found guilty of certain specified charges after a hearing may be dismissed).[6]

Thus, there is ample authority supporting today's holding that a probationary employee has a protected property interest where that employee's status can only be altered if his conduct or capacity is found to be not satisfactory.

### d. The Effect of the Merit Commission Regulations and the Pension Board Statute and Regulations

As discussed above, an examination of the statute governing the Merit Commission reveals that Marvin has a property interest. Nonetheless, defendants argue that certain provisions of the Merit Commission regulations and the statutes and regulations governing the Pension Fund Board mandate a contrary conclusion. Specifically, defendants assert that individuals such as Marvin are not "officially" appointed as probationers until they pass the physical and mental exams for entrance into the 1977 Pension Fund. However, even though it is true that statutes must be read in harmony, the defendants' argument must be rejected for several reasons.

■ First, there is binding Indiana Supreme Court authority holding that the

Pension Fund laws were not applicable to probationers at the time of Marvin's appointment. In *State ex rel. Hensley v. Cooley*, 254 Ind. 453, 260 N.E.2d 598 (1970), a case also involving the City of Muncie, Michael Hensley went through the screening and training stages and was appointed as a probationary policeman under Muncie's merit plan. Pursuant to the same state statute invoked in this case, Hensley was a probationer for one year.

After six months of service, however, he was called before the Merit Commission for a hearing on charges that he lacked the physical capacity to serve. He was found unfit, and appealed to the courts. The sole issue before the Indiana Supreme Court was "whether the Merit Commission had the authority to make a determination as to appellant's physical ability to serve during the probationary period or whether ... this was the proper function of the Board of Trustees of the Pension Fund." *Hensley*, 260 N.E.2d at 599. After reviewing the statutory schemes, which involved the same Merit statute and similar Pension Fund laws as apply in this case, the *Hensley* court ruled that during the one year probationary period, the Pension Fund laws are not applicable to probationers.

In reaching this conclusion, the unanimous Indiana Supreme Court relied on the different purposes of the Merit Commission and Pension Fund laws. The thrust of the holding was that the Merit Commission laws envision a probationary period during which only the Commission can determine if the probationer is fit to serve. Because of its importance to this case, the *Hensley* court's reasoning is worthy of lengthy quotation here:

> "unsatisfactory" standard imposed any substantive limit on the employer's discretion thus giving rise to a property interest. As discussed in today's opinion, the satisfactory standard, coupled with the right to a hearing and the significant effort that must be taken to become a probationer in the Muncie Fire Department, indicate that the employer's discretion is substantively limited and that the employee does have a legitimate claim of entitlement to his probationary status.

**6.** It should be noted that the decision in *Gansert v. Meeks*, 384 N.E.2d 1140 (Ind.App.1979), in which the court found that a probationary policeman did not have a property interest, is inapposite here for several reasons. First, in *Gansert* different statutes and rules applied, and they did not give the probationer any right to a hearing. Second, the statutory scheme gave the county sheriff sole discretion to determine whether the probationer should continue forward as a permanent officer. Finally, the *Gansert* court did not squarely focus on whether the

In 1963 the citizens of the City of Muncie elected to adopt a so-called 'Merit Law.' The main purpose of this act was to take the appointment and discharge of ... firemen from the Board of Public Works and Safety where the tenure was uncertain for political reasons. In its place a 'Merit Commission' was provided for in the new optional law. One of the main innovations of the 'Merit Law' was that the new ... firemen were hired for a probationary period and their performance was subject to scrutiny by the commission for a full year before they became regular ... firemen. The reasons for this probationary period are quite obvious. The Merit Commission appears to have been given broad powers in its supervision of ... firemen during the probationary period of one year.

*Hensley,* 260 N.E.2d at 600.

Then, in explaining why application of the Pension Fund laws to probationers would thwart the purpose of the probationary period as well as the goal of the Pension Fund laws, the court wrote:

We feel an interpretation of the 'Merit Law' and the Pension ... Statute ... must give consideration to the legislative objective. It is our judgment and opinion that the Pension ... Law is applicable *only to the permanent and regular appointees* of the ... Fire Department and *not to the probationary members* until they have acquired regular status and have met the full one year probationary requirement. It is obvious to us that some physical disabilities and physical incapacities which an appointee has prior to probationary appointment may not reveal themselves until after an appointment on probation, and it would be obviously unjust and unfair to place upon the taxpaying unit the burden of paying a disability to such a probationer for an incapacity that existed prior to appointment.

*Hensley,* 260 N.E.2d at 600 (emphasis added).

Thus, the Indiana Supreme Court, as a matter of statutory construction, reasoned that the probationary period would be infringed upon if the Pension exams were given during that period, and also concluded that the Pension Fund would be jeopardized if those same exams were given prior to the conclusion of the probationary period.

Thus, under the *Hensley* holding, the Merit Commission lacked the power to condition Marvin's probationary appointment upon his passage of the Pension Board's exams was contrary to law. The Commission could (and was required to) follow the statute and condition his *final* appointment on whether he satisfactorily passed his probation; it could not impose conditions on his *probationary* appointment.

■ Similarly, the Commission's Rule 4, Section IX, which purports to require applicants to pass the Pension Board's exams before "official appointment," must be interpreted and applied consistently with the *Hensley* mandate. That is, the use of the term "official appointment" must be construed as meaning "final and permanent" appointment as used in the Merit Commission's enabling statute. Indeed, as the Indiana Court of Appeals held in *Pastrick,* the Merit Commission does not have the discretion to refuse to appoint those next in line on the eligibility list. *Pastrick,* 438 N.E.2d 762.

Further evidence that the Merit Commission's probationary appointment of firefighters was, at the time of Marvin's appointment, separate and independent from the Pension Fund exams is found at *Ind. Code* § 36–8–3–21. Under this provision, which became effective on January 1, 1986, an individual may not be employed as a "member of the unit's fire department ... unless the individual meets the conditions for membership in the 1977 fund." The enactment of this provision is an implicit recognition that under prior law, which governs Gregory Marvin's case, membership in the 1977 fund was not a permissible prerequisite to being a probationary appointee.

Thus, the property interest created by the Merit Commission laws in Title 19 is not nullified by the Pension Fund laws. This Court, just like the Commission, is

obligated to follow the mandate of the *Hensley* decision, which has never been disturbed by a later opinion of the Indiana appellate courts, and, at the time of Marvin's appointment, had not yet been effectively overruled by the legislature.

■ Moreover, even assuming arguendo that the Pension Fund laws do apply,[7] and that the "conditional" probationary appointment of Marvin was permissible, he still had a property interest. At the time of his appointment, Marvin was, at the very least, ensured of being a probationary employee unless: (1) the Merit Commission found his conduct or capacity not satisfactory, or, (2) the Pension Board determined that he was not physically or mentally fit to serve. Thus, even if the Pension Board laws applied as of his "appointment" of January 3, 1985, Marvin could not be divested of his status for arbitrary reasons.

To the contrary, he had to be found not satisfactory, which, as discussed previously, is a sufficient substantive limit on discretion upon which a property interest can be based. Alternatively, he had to be found mentally or physically unsuitable by the Pension Board. As the Board's governing statute provides, the purpose of the mental examination "is to determine if the ... firefighter is mentally suitable to be a member of the department." Thus, having been appointed by the Merit Commission and having passed the Pension Board's physical exam, Marvin's status could only be altered if he did not pass a mental exam geared at determining his mental suitability to serve.

At this stage, then, assuming arguendo that the Pension Board statutes applied to Marvin, it must be concluded that he had a protected property interest. The Board's discretion was limited by a specific statutory standard, and the Board was required to follow certain procedures in determining whether Marvin met that standard. The Board was required to designate a licensed expert to give the exam, and, just as under earlier versions of the Pension laws, the Board, which is made up of lay persons, did not have the discretion to determine for themselves whether the appointee had passed the exam. *See Fallowfield v. State*, 167 N.E.2d 44 (Ind.1960) (where trustees of pension fund selected doctors to examine appointee and those doctors submitted a favorable report, the trustees could not thereafter determine for themselves whether the appointee had passed the exam).

Accordingly, even if the Pension laws applied to Marvin, he retained a protected property interest. At the least, his place as a probationary firefighter, which he had gone to significant lengths to obtain, could not be altered unless he did not meet specific standards. In the event that he did not meet the mental suitability standard, he was entitled to an additional evaluation per Section 25 of the Board's by-laws, and a pre-deprivation hearing pursuant to Commission statutes and federal case law.

Thus, under both possible constructions of these statutes, Gregory Marvin had a protected property interest in his status as a probationary appointee.[8]

---

**7.** The Pension Fund statute in force during Marvin's appointment states that it is applicable to "full-time, fully paid firefighters hired after April 30, 1977...." *Ind.Code* § 36–8–8–1. Even without the *Hensley* opinion, it is thus not entirely clear whether the Pension Fund laws apply to probationers. Moreover, accepting the defendants' argument that a probationer is not protected by the "for cause" provisions extended to "members" of the fire department under *Ind. Code* § 19–1–14–19 would support the conclusion that the Pension Fund statute does not apply to probationers.

**8.** The final issue, and that which was tried to the Court, is whether there was a mutually explicit understanding sufficient to give rise to a

property interest. Because the statutes and regulations involved conferred such an interest, this issue is not dispositive. However, if the issue somehow becomes dispositive at a later juncture due to appeal, the Court finds that no such mutually explicit understanding was proven. The Commission members making the appointment apparently, but mistakenly, believed that the appointees did not get any protections until they cleared the Pension Board hurdles. Notwithstanding the testimony of those who passed the Commission Rules, no mutually explicit understanding existed beyond that which was actually conferred by statute and regulation.

### e. Summary of due process issue

In summary, the Court's prior ruling on the due process issue must be set aside in that the wrong Merit Commission statute was applied. Pursuant to its home-rule election, Muncie opted to remain bound by Title 19's merit laws. Under this statutory scheme, Gregory Marvin had a protected property interest in his continued status as a probationary appointee. The existence of the Pension Fund laws, even if applicable to probationers, did not nullify his interest. The Commission or the Board could only alter his status upon a showing that he failed to meet substantive statutory standards that restricted their discretion; Marvin could not be denied continued probationary employment "at will." Thus, Marvin had a protected property interest in his status as a probationer.

This does not mean that he had a property interest in being a permanent firefighter. To the contrary, Marvin had to endure a year of probation and had to successfully pass a proper mental examination. Marvin had in essence obtained the final opportunity to prove himself. This opportunity was sufficiently protected by state statute such that it could not be nullified without a hearing, but it is not the equivalent of permanent status. These factors will be considered in determining Marvin's damages, as discussed at the end of this opinion.

■ Finally, it should be noted that the Court's prior ruling granting summary judgment for the individual defendants on the qualified immunity issue remains intact. As is obvious from this opinion, the statutes and regulations involved in this case are less than lucid. Certainly it was not clearly established in January of 1985 that the defendants' actions would violate Marvin's constitutional rights.

### 2. *First Amendment Issues:*

■ In Count Two of his Complaint, Marvin asserts that the real reason he was denied continued employment is that he is a Republican and that he was discriminated against for his expression of his political patronage. Indeed, at the summary judg-

ment stage Marvin came forth with sufficient evidence raising a genuine issue of material fact as to whether this was actually the reason behind the altering of his employment status.

At summary judgment, however, this Court ruled that Marvin could not prevail on this claim under the Seventh Circuit's decision in *Rutan v. Republican Party of Illinois,* 868 F.2d 943 (7th Cir.1989) (*en banc*), cert. granted —— U.S. ——, 110 S.Ct. 48, 107 L.Ed.2d 17 (1989). In rejecting Marvin's political patronage claim, this Court reasoned in essence that even if Marvin had not been hired due to politics, such an action did not violate the First Amendment. This Court's summary judgment decision, however, requires reexamination in light of the present understanding of Marvin's protected position as a probationary firefighter. In short, the conduct complained of here is not simply a failure to hire; rather, it is the cessation of a probationary employment relationship that took significant time and effort to achieve. The question is thus whether such an action is protected under *Rutan.*

In *Rutan,* the Seventh Circuit held that while a state employee who is laid off from a temporary position because of his political persuasions does have a cause of action for violation of First Amendment rights, *Id.* at 956–57, a mere "applicant" for public employment who is not hired because of party politics does not state such a claim. *Id.* at 954–55. The crux of the Seventh Circuit's *en banc* holding is that only those actions that "impose a hardship upon an employee comparable to the loss of job" are protected by the First Amendment in these settings. *Id.* at 954.

The rationale offered is that the failure to hire someone is not as intrusive as the termination of someone who is already employed. As Judge Manion wrote for the *en banc* panel:

By favoring political supporters or those who are connected with political supporters, a patronage system will unquestionably have some negative effects on those people who did not support or are not connected with the party or fac-

tion in power. The partisan denial of a promotion, transfer, or employment application leaves someone in a possibly lesser position than he would have been absent patronage considerations. At the same time, however, the burden imposed by such patronage decisions is much less significant than losing a job.

*Rutan,* 868 F.2d at 952.

Although this type of "hiring/firing" distinction has been criticized by some in this setting on the grounds that it is not the kind of analysis that the Supreme Court intended in its few decisions in this area, *see Messer v. Curci,* 881 F.2d 219, 225–26 (6th Cir.1989) (*en banc*) (Merritt, J., dissenting), and while others have employed a different test, *see Agosto-de-Feliciano v. Aponte–Roque,* 889 F.2d 1209, 1217–18 (1st Cir.1989) (summarizing differing standards and choosing one between the extremes), the present standard applicable to this District Court is that pronounced by the Seventh Circuit in *Rutan,* at least until such time that the Supreme Court clears the waters in this area. *See* 58 U.S.L.W. 3461 (summary of the January 16, 1990, oral argument held before the Supreme Court in the *Rutan* case).

The test in this case is thus whether the defendants' actions were the "substantial equivalent to a dismissal." *Rutan,* 868 F.2d at 950–54. Key factors in this analysis are whether the "employee has an important stake in his position with his employer," whether the individual's "financial affairs and other obligations will be arranged around certain settled expectations that his paychecks will continue," and the "coercion and control that an employer may exercise over an employee by threat of termination...." *Id.* at 952. Mere applicants do not meet these tests because a patronage system simply "lowers [their] chances for receiving employment at one of many potential employers." *Id.* "If [the applicant] is employed elsewhere, a rejected application will probably have little effect on his income." *Id.*

In this case it is apparent that Gregory Marvin was more than just a mere applicant. To the contrary, he had passed through four of the five stages towards becoming a permanent firefighter, and had been appointed a probationary firefighter. His status as a probationer could only be altered for statutorily specified substantive reasons. Moreover, the governing merit statute specifically provided that the political affiliation of new personnel could not be considered. *Ind.Code* § 19–1–14–17. Indeed, as the Indiana Supreme Court has noted, the whole purpose of the merit laws is to "take the appointment and discharge of ... firemen from the Board of Public Works and Safety where the tenure was uncertain for political reasons." *Hensley,* 260 N.E.2d at 600.

In each of these cases, the question of whether a "particular employment action is equivalent to dismissal rests upon each case's facts and circumstances." *Rutan,* 868 F.2d at 955. Here, the action taken against Marvin lies somewhere in between a full-fledged dismissal of a permanent employee and the refusal to hire a mere applicant. Upon review of the record and the governing statutes, it appears that the decision affecting Marvin was, in fact, the equivalent of a dismissal. Marvin had not merely walked in the door to ask for work. Quite the contrary, he had devoted significant amounts of time, money, and effort to earning his spot as a probationary firefighter. Thus, at the very least, it is clear that this issue cannot be resolved against the plaintiff on summary judgment.

Accordingly, the Court sets aside its prior grant of summary judgment on this issue. There are thus two issues to be resolved at trial on this First Amendment claim, namely, whether the action taken against Marvin was taken because of his political affiliation, and whether that action was equivalent to a dismissal.

B. Damages:

Although the Court initially intended to decide damages soon after the bench trial, it is apparent from today's decision that the parties should be given the opportunity to reflect on the opinion and choose their course of action. Accordingly, the Court holds in abeyance the issue of damages on

the due process claim, subject to the following scheduling order:

1. A status conference of attorneys is scheduled for Thursday, April 26, 1990, at 9:00 A.M. Counsel shall have conferred by telephone prior to the conference to discuss the agenda. Counsel shall be prepared to discuss the damages issue on the due process claim, the scheduling of trial for the First Amendment claim, and the issue of whether damages that might be awarded for a successful First Amendment claim would be different than those awarded in the due process claim.

2. The Court will thereafter establish a briefing schedule and trial date.

IT IS SO ORDERED.