Dennis BROUGHAM, Plaintiff–
Respondent,

v.

CITY OF NORMANDY, Defendant–
Appellant.

No. 58522.

Missouri Court of Appeals,
Eastern District,
Division Four.

June 28, 1991.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Aug. 8, 1991.

Application to Transfer Denied
Sept. 10, 1991.

Kevin M. O'Keefe, St. Louis, for defendant-appellant.

Richard Andrew Barry II, St. Louis, for plaintiff-respondent.

SATZ, Judge.

This is a review of an administrative decision pursuant to chapter 563 RSMo 1986. Defendant, the City of Normandy (City), terminated the employment of plaintiff, Dennis Brougham, as a police officer, after a hearing before the City's Personnel Board (Board). The termination was based on two events. During the first event, the Board found that plaintiff had shirked his duty while at work, and, during the second event, the Board found that he had improperly refused to answer questions asked him during an internal affairs investigation.

Plaintiff petitioned the trial court to review his termination. The trial court found there was insufficient evidence to support the finding that plaintiff shirked his duty during the first event but found there was sufficient evidence to support the finding that plaintiff improperly refused to answer the questions asked him during the internal affairs investigation. The court, however, found the dismissal of plaintiff to be excessive and remanded the cause to the City with direction to reinstate plaintiff without back pay. The City appeals.

Like the trial court, we find there was insufficient evidence to support the finding that plaintiff shirked his duty, but we find there was sufficient evidence that he im-

properly refused to answer the questions asked him. But, unlike the trial court, we find that termination, among other discipline, was permissible and, therefore, remand this cause to the City to impose the discipline it deems appropriate.

■ We review the decision of the administrative body, not the judgment of the trial court. *E.g. Gamble v. Hoffman*, 732 S.W.2d 890 (Mo. banc 1987). We defer to the credibility determinations of the administrative body, *Edmonds v. McNeal*, 596 S.W.2d 403, 408 (Mo. banc 1980), and view the evidence and all permissible inferences most favorable to that body's decision. *Gamble, supra* at 892. We determine whether the evidence, so viewed, supports the decision or whether the decision constituted an abuse of discretion. *Id.*

### First Event

■ Stripping the Findings of Fact of the Board to their essentials, the Board found that plaintiff shirked his duty on the night of November 15, 1988.

On that night, plaintiff was scheduled to work the shift beginning at 10:00 p.m. A Sergeant Kenner (Kenner) was the supervisor and the other officer scheduled to work that shift. Plaintiff arrived at the station about 9:45 p.m., his assigned time of arrival. However, plaintiff did not leave the station to go out on patrol until 10:50 p.m. Kenner did not leave the station until 10:38 p.m.

During the fifty minutes the plaintiff remained in the station, the City contends, there were four calls for police assistance which the City characterizes as "emergency" calls. These calls, the City contends, required the attention of the City's police officers but went unanswered. We shall detail these calls later.

During the time plaintiff remained in the station, there were two unmarked police cars in the station's parking lot. However, the City had a vehicle assignment policy which prohibited an officer from using a vehicle other than the one assigned to him "unless on an emergency basis at the direction of the supervisor on duty." Plaintiff said the reason he did not answer the

calls and did not leave the station until 10:50 p.m. was that he did not have his assigned police car available and Kenner ordered him to stay in the station until the officer driving that car returned to the station.

Kenner testified that, at 10:04 p.m., rather than responding to a call in an unmarked car, he decided that "it would probably be prudent to wait a few minutes and until the proper marked units came in." He said that he expected them to be on their way "at any moment."

There was a violent rainstorm in the area at that time. All four of the City's officers on patrol on the earlier shift were busy assisting officers from surrounding cities, directing traffic around a multiple-car accident on a nearby interstate highway. These officers were using all four of the City's marked police cars, and they remained engaged with the accident until about 10:30 p.m. Some then returned directly to the station. However, the officer driving plaintiff's assigned car answered an alarm call on his way back to the station, and he did not arrive at the station until about 10:42 p.m. Meanwhile, plaintiff performed no police work except to answer one telephone call and speak briefly to a dispatcher.

The Board found that emergency circumstances existed in the City while plaintiff and Sergeant Kenner were in the station and that plaintiff failed to recognize and attend to the emergency circumstances. This failure, the Board found, was a dereliction of his duty.

On appeal, the City contends the question of whether Kenner ordered plaintiff to remain in the station is a matter of credibility, and, the City contends, the Board chose not to believe plaintiff or Kenner and could have believed their story was only an after-the-fact rationalization of their actions.

The Board did not expressly discredit the testimony of plaintiff or Kenner. By implication, however, it must have done so. Nonetheless, the Board may not find a fact contrary to the evidence merely because it is the converse of some fact asserted in

discredited testimony. All other evidence probative on this issue is consistent with plaintiff's having been ordered to stay in the station. This is no evidence that Kenner did not order plaintiff to stay.

The City itself introduced a tape recording and transcript of communications over the Municipal Radio System, a central police dispatching service. These communications show that plaintiff told the dispatcher, at 10:00 p.m. that night, that he could not respond to a report of downed electrical wires because he did not have a car. Two minutes later, Kenner told the dispatcher that he could not respond to the same report because "we don't have any cars.... If they come in with our cars, we'll get out there and start taking these." The evidence also shows plaintiff and Kenner both left the station shortly after their respective assigned cars returned.

This evidence shows that, at the time of his charged inaction, plaintiff, at least ostensibly, was relying on the perceived order from Kenner to wait for his assigned car. The order certainly was not, as the City contends, the plaintiff's after-the-fact rationalization. And, it cannot simply be dismissed as a matter of credibility.

However, the City also argues that plaintiff's duty required him to obey only proper or legitimate orders, and, thus, his duty obliged him to exercise good judgment to determine the propriety of orders. This obligation, as we understand the City's argument, required plaintiff to disobey Kenner's order to remain in the station, if the order were given, because the emergency circumstances then existing rendered the order improper or illegitimate. In short, plaintiff cannot excuse his dereliction of duty on the grounds his supervisor ordered him to do it.

The evidence, however, does not support a finding that emergency circumstances existed which required plaintiff to respond. According to the tape recording introduced by the City, there were four calls made during the time plaintiff was in the station, which, the City contends, constituted "emergency circumstances". These calls related to a house fire on Bermuda Avenue; downed power lines on Stanwood Avenue; a house alarm sounding on Augusta Avenue; and a disturbance on Waco Avenue.

However, the tape and transcript of communications between the dispatcher and various police units show that the fire on Bermuda Avenue was answered by the fire department by 9:47 p.m., or just a minute or two after plaintiff arrived at the station. A police officer from another city took the fire call at 9:48 p.m. and reported at 9:56 p.m. that there was no immediate emergency. There was no further radio traffic about the house fire. ·

The request for a "standby" to watch over downed power lines on Stanwood Avenue was the subject of a conversation between Kenner and the dispatcher. During that conversation, the dispatcher told Kenner the wires were down in a back yard, and the fire department was on the scene. According to the tape, Kenner responded: "if the wires aren't hurting anything let them ride ... We're not going to sit on that anyway, we're not going to worry about that then." Thus, Kenner, plaintiff's supervisor, determined the call did not require an immediate response. Kenner eventually responded to the request at 10:39 p.m. and left the scene of these downed wires three minutes later.

The dispatcher first mentioned the alarm sounding on Augusta Avenue at 10:30 p.m. The officer who was returning to the station with plaintiff's assigned car responded immediately. He reported that no alarm was sounding.

The final so-called "emergency" related to a disturbance reported on Waco Avenue, which was first mentioned over the police radio at 10:42 p.m. This was approximately eight minutes before plaintiff left the station and before he had a car available. According to the transcript of that transmission, plaintiff told the dispatcher he could walk to the Waco call. The dispatcher canceled the call before anyone responded.

Thus, the record does not show that four calls went unanswered while the plaintiff remained in the station. It shows that two

of the calls were answered immediately, and a third was canceled before the plaintiff could have responded. Plaintiff, therefore, cannot be faulted for his failure to respond to these calls.

Arguably, one of the four calls did require his response: the downed wires on Stanwood Avenue. But, the plaintiff failed to respond only after Kenner determined there was no danger to the public because the wires were down in a back yard and the fire department was at the scene. Beyond making a conclusory statement, the City has not shown how this constituted an emergency circumstance obliging the plaintiff to disobey orders.

Moreover, the officers who were working on the accident on the highway testified they did not require or request help from plaintiff or Kenner. Furthermore, the City's Chief of Police admitted in his testimony that plaintiff might have faced disciplinary action had he done what the City now argues he should have.

Quite simply, there is no substantial evidence to support a finding that emergency circumstances required plaintiff to disobey orders, if they were given, and violate department policy. Therefore, the City's decision to dismiss plaintiff, to the extent it was based on the events of November 15, was an abuse of discretion. *Edmonds, supra,* 596 S.W.2d at 407.

■ Admittedly, the Board also found that plaintiff was not truthful to investigators when asked about the events of November 15. A Sergeant Donald Pollak (Pollak), who conducted the internal investigation, did write in a report dated December 1, 1988 that plaintiff, when asked what time he went out on patrol on November 15, initially said it was at 10:25 or 10:30 p.m., even though "records" showed he left the station sometime between 10:43 p.m. and 10:50 p.m. The City has made this report part of its legal file. However, in his testimony before the Board, Pollak did not refer to this statement of plaintiff, and the record before us does not show the report was introduced into evidence at the hearing before the Board. Therefore, the Board and, in turn, the City cannot rely on this evidence of "untruthful" responses to support the charges against plaintiff arising out of the November 15 incident.

### Second Event

■ There is, however, substantial evidence to support the Board's findings that plaintiff improperly refused to answer questions asked him during an internal affairs investigation conducted on December 11 and 12, 1988.

On December 11, plaintiff reported to work with a superficial cut on the little finger of his left hand. He asked to be taken to the emergency room for treatment. There, a doctor administered a local anaesthetic and closed the cut with four stitches. Plaintiff asked the doctor whether the injury would "get me out of work for a few days or today...." The doctor replied, "No, you need to go back to work." Plaintiff returned to the station and told his supervisor he could not work because of the injury to his hand. He also told the supervisor he would see his doctor the following day and return to work when his doctor approved. His supervisor permitted him to leave.

The following day, plaintiff did not work his scheduled shift. Instead, he saw his personal doctor who told him he could return to work. He came to the station to tell his supervisors he would return to work the following day. While he was there, he was questioned by Pollak, who was conducting an internal affairs investigation, about plaintiff's absences from work. Plaintiff refused to answer any questions and asked to speak to his attorney first. He continued to ask for his attorney even after he was told there was no criminal investigation taking place, he had no right to an attorney, and his refusal to answer could lead to the loss of his job. The Chief of Police then suspended plaintiff immediately for the purpose of starting dismissal proceedings.

■ This is sufficient evidence to support a finding that plaintiff refused to answer questions about his absence from work on December 11 and 12. Even dis-

924

regarding Brougham's absences, his refusal to answer questions put to him by his supervisors about his non-performance of his duties alone justified some kind of discipline. *See, e.g., Worley v. Whaley*, 586 S.W.2d 721 (Mo.App.1979); *see also Schulte v. Sayad*, 667 S.W.2d 26, 28 (Mo. App.1984).

Plaintiff contends his request to speak to his attorney for a few minutes before answering questions does not amount to a refusal to answer. We disagree.

■ Plaintiff never answered any questions, even after he was told he had no right to an attorney and could lose his job. He does not contend he had a right to speak to an attorney, and, if he did, this contention would be unwarranted. There is no right to counsel at the investigatory stage of an administrative proceeding conferred by Chapter 536, RSMo or the United States Constitution. *In re Groban*, 352 U.S. 330, 77 S.Ct. 510, 1 L.Ed.2d 376 (1957); *See* Annotation, 33 ALR3d 229, 249–50 (1970). Rather, plaintiff contends his request was reasonable and no legitimate reason existed for the investigators to deny his request to speak to his lawyer. This begs the question. His supervisors needed no reason to refuse to let him do that which he had no right to do.

■ The plaintiff also argues he cannot be disciplined for his refusal to answer questions because his supervisors failed to warn him that his responses could not be used against him in criminal proceedings. We disagree.

Plaintiff, apparently, bases his argument on what has been called a "Garrity warning." In *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), the Court held that incriminating statements obtained from public employees through threats against their employment could not be used in subsequent criminal proceedings. 385 U.S. at 500, 87 S.Ct. at 620. This protection is based upon the Fifth Amendment, as incorporated by the Fourteenth Amendment. *Id.* at 497–98, 87 S.Ct. at 618–19. *Garrity's* progeny have developed the principle, as a matter of constitutional law, that a public employer may not terminate an employee for refusing to answer incriminating questions unless it first warns him his statements cannot be used in criminal proceedings. *Brown v. City of North Kansas City*, 779 S.W.2d 596, 597–98 (Mo.App.1989).

Obviously, the Fifth Amendment privilege against self-incrimination is implicated only where criminal charges could conceivably result from the investigation. *See Worley, supra* at 722. And, the person claiming the protection of the privilege must show the question asked calls for an answer which may incriminate him. *Id; see also State ex rel Caloia v. Weinstein*, 525 S.W.2d 779, 781 (Mo.App.1975). In appraising the claim, the court must be "sensitive to the circumstances and perceptive in viewing the possibilities of incrimination." *Caloia, supra* at 781. Even so viewed, we find nothing in the record which indicates plaintiff was threatened with criminal proceedings, and plaintiff has not shown he was. Moreover, plaintiff testified he was aware that nothing he said in an internal affairs investigation could be used against him in criminal proceedings, having read of it in materials supplied by the Fraternal Order of Police. This is sufficient to charge the plaintiff with knowledge of his rights. *Worley, supra* at 722.

■ Plaintiff also argues that the City exceeded its powers when it terminated his employment. Section 9.3 of Ordinance 207 of the City states that "[d]iscipline shall be, whenever possible, of an increasingly progressive nature, the step of progression being (a) written reprimand and warning, (b) suspension, (c) demotion when possible or practicable, (d) dismissal." Plaintiff argues that use of the mandatory language "shall be" precludes dismissal of an employee unless he has previously been reprimanded, suspended and demoted. We disagree.

The section also uses the language "whenever possible," clearly indicating that the steps of progression are meant to be a guide, not a mandate. The Board and, in turn, the City found this section did not preclude imposition of discipline commensu-

rate with the severity of the underlying violation, and we find that to be a more reasonable construction of this section than that proposed by plaintiff.

■ The City has broad discretion to impose whatever discipline it finds appropriate, so long as that discipline falls within the range of disciplines permitted for a violation of its code of conduct. *See, State ex rel Baer v. Campbell,* 794 S.W.2d 690, 691 (Mo.App.1990). And, dismissal is an appropriate discipline for refusal to answer questions related to job performance. *Worley v. Whaley, supra; see also Schulte v. Sayad, supra.*

Accordingly, we affirm the trial court's judgment to the extent it finds that plaintiff violated his duties during the second event but that he did not do so during the first event. However, dismissal is a discipline which may be imposed for plaintiff's violation of his duties. Therefore, we reverse the direction of the trial court to the City to reinstate plaintiff without back pay.

■ The Board's recommendation of dismissal and the City's adoption of that recommendation were based upon the cumulative effect of plaintiff's conduct during both events, rather than being based only upon plaintiff's conduct during the second event. Therefore, neither the holding nor the teaching of *State ex rel Trautman v. City of Farmington,* 799 S.W.2d 638 (Mo.App.1990) authorizes or permits us to impose dismissal, or any other discipline, as the appropriate discipline for plaintiff's improper conduct. Accordingly, we remand this cause to the trial court and direct it to remand the cause to the City for the City to impose the permissible discipline it deems appropriate in view of this opinion and decision.

SMITH, P.J., and CARL R. GAERTNER, J., concur.