Edward J. LUCAS, Petitioner,

v.

MURRAY CITY CIVIL SERVICE
COMMISSION and Murray City
Corporation, Respondents.

No. 960803–CA.

Court of Appeals of Utah.

Nov. 28, 1997.

Bryon J. Benevento and D. Matthew Moscon, Salt Lake City, for Petitioner.

H. Craig Hall, Murray, and Dennis C. Ferguson, Salt Lake City, for Respondents.

Before WILKINS, Associate P.J., and DAVIS and BENCH, JJ.

## OPINION

WILKINS, Associate Presiding Judge:

Petitioner Edward J. Lucas appeals the decision of the Murray City Civil Service Commission (Commission) affirming his ter-

mination as a Murray City Police Officer. We reverse the Commission's decision and reinstate Lucas with back pay.

## BACKGROUND

Lucas served as a police officer for the Murray City Police Department (Department) from July 1, 1985 through August 21, 1996. During that time, Lucas was considered by his superiors to be an outstanding officer. His service record shows that he had always met or exceeded the Department's expectations and that he received all available merit raises. In addition, Lucas's exemplary service earned him the "Merit of Honor" award—the most prestigious award presented to an officer. He is the only officer in the Department to have ever received this honor. Until August 1996, Lucas had never been reprimanded, disciplined, or investigated by internal affairs.

On August 21, 1996, the Department fired Lucas for allegedly lying during an internal affairs investigation regarding an allegation that Lucas had used excessive force while searching an arrestee. The internal affairs investigation arose from the circumstances surrounding the May 27, 1996 arrest of Martin Spegar.

On the evening of May 27, Officers Snow, Johnson, and Lucas were dispatched to a Murray City car dealership to investigate a vehicle burglary in progress. Upon arriving, Officer Snow saw two males running through a parking lot adjacent to the dealership and climbing over a wall. Within moments, Officer Snow received information that three suspects had been apprehended. Officer Johnson had one suspect, Dustin Garcia, in custody, and Officer Lucas had apprehended the others, Michael Hamblin and Spegar. Because it was dark and raining, the officers performed only a basic pat down search at the scene before taking them to the Murray City Police Department. Lucas transported Spegar without incident, and was, as Spegar stated, very courteous.

At the station, Spegar and Hamblin were placed in adjoining offices. Garcia was placed in an interview room about twenty to thirty feet away from both Spegar and Hamblin. Officer Johnson searched Hamblin, Officer Snow searched Garcia, and Officer Lucas "kept an eye on Spegar." During that time, Officer Lucas performed a more thorough search and asked Spegar to empty his pockets. After Officer Snow saw Spegar emptying his pockets, he walked into the room to take Spegar's statement and Officer Lucas left. Nothing was said. Eventually, all three suspects were searched, mirandized, interviewed, and taken to jail. En route to the jail, Officer Snow noted that Spegar was not upset and was joking with his friends.

A few days later, Lieutenant Fondaco, Lucas's superior, received a letter about Lucas's alleged conduct during Spegar's search. Spegar's written statement alleged:

[Officer Lucas] told me to stand up and empty my pockets onto the table, and also to take off my hat. He then asked me to wait before I did it. He [illegible] for a minute and took out his gun from his holster and pointed it in the direction of my head. He was standing about three feet away from me. He then [said] "I dare you to pull out a gun because if you do I swear that I will [ ] kill you," and that your brains will be splattered on the wall!

I then [said] "Hey man, I might be crazy trying to break into cars, but I'm not going to pull anything on you."

[Lucas] said, "I don't care, but I am that crazy."

On June 10, 1996, Lieutenant Fondaco began an internal affairs investigation into Officer Lucas's alleged use of excessive force. During the investigation, Lucas was interviewed on two separate occasions. During the first interview, conducted by Lieutenant Fondaco, Lucas described the incident as follows. Lucas stated that he walked into the room where Spegar was being held. He unhandcuffed Spegar and told him to empty his pockets. Instead of reaching for his pocket, Spegar reached for the crotch area of his pants. Lucas testified that he believed that Spegar may have been going for a weapon because he knew, as a result of his cursory search of Spegar at the scene, that Spegar had something in his pocket. Immediately, Lucas reacted by pushing Spegar away, yelling "put your hands on the wall," and reach-

ing for and unsnapping his weapon. He stated that he believed that he started to pull his gun out, but that it remained in the holster. At that point, Lucas searched Spegar's legs and crotch, and then asked Spegar to empty his pockets, which contained pliers, a flashlight, and other miscellaneous items.

At some time during the internal affairs investigation, Officer Snow gave a written statement regarding what he observed. Officer Snow related that after searching Garcia and taking his statement in the interview room, he went down the hall toward the office in which Spegar was being held. Officer Snow paused briefly before entering the office when he noticed that Officer Lucas had his gun out of its holster and pointed at the ground, in a "low ready position." He saw Spegar standing sideways, not looking directly at Officer Lucas. He watched as Spegar took off his hat and noticed a flashlight and pliers on the table. Officer Snow stated that as he entered the room to take Spegar's statement, Officer Lucas holstered his weapon and then left. He stated he did not hear or observe anything that had happened before and stated he did not see Officer Lucas point his gun at Spegar. In addition, Officer Snow filed a police report and did not mention any of the events he observed between Officer Lucas and Spegar because, as he stated, "I hadn't even considered it a policy violation."

Garcia asserted that while in the interview room, about twenty to thirty feet away, he overheard Lucas threaten Spegar. However, Hamblin, who was in the office next to Spegar, heard nothing. Moreover, Officer Snow, who was en route from Garcia's room to Spegar's room, also heard nothing.

As a result of this information, the focus of the internal affairs investigation became whether Lucas had been dishonest during the excessive force investigation. As part of the investigation, both Lucas and Spegar agreed to take a polygraph test on July 11, 1996. During the polygraph test, Spegar initially stated that Lucas had pointed the gun at his head. Then, as the interview progressed, he stated that, looking back, the gun may have been pointed at him or elsewhere such as toward the floor. Spegar did,

however, state that Lucas's gun was definitely out of its holster. During Lucas's polygraph test, Lucas stated that he still perceived that his gun was holstered, but that he had no reason to doubt Officer Snow's statement. Both interviews were transcribed. Lucas's polygraph test could not be administered because "yes" and "no" questions could not be posed; Spegar's test was inconclusive.

After reviewing this information, Lieutenant Fondaco concluded that Officer Lucas had been dishonest and, on July 26, 1996, recommended that he be discharged. On August 5, 1996, Officer Lucas received a pretermination notice listing four grounds for discharge: (1) dishonesty in denying the events which occurred concerning a service weapon; (2) excessive force; (3) improper search techniques; and (4) conduct unbecoming an officer. On August 7, 1997, Chief Killian conducted Lucas's pretermination hearing. During that hearing, Lucas tried to address each of the grounds for termination, although the record shows that even the Chief was unclear as to what evidence supported the charge of "improper search techniques." In discussing the charges, Lucas again explained:

Spegar is in my custody. I start to pat him down. He's got something protruding from his pocket. I grab it and pull on it. He starts yelling. What's wrong? He's not saying anything, just smiles. It's kind of weird. Pulled on it again, obvious discomfort. Well, it's dark here, I can't see what's going on. It's raining. It's inappropriate to do this here. I'm not going to unhandcuff him outside in the street to let him empty his pockets, and I'm not sticking my hand down in there. I don't know if it's a blade. I don't know what's going on. So, obviously it's going to be something he's gonna have to do. I'm going to do that in a well-lit situation, in the department, so I chose to transport him as such. Handcuff him in my front seat where I could keep an eye on him where if he does make any further movements, I can take appropriate action.

. . . .

I believe he has sharp devices in his pocket which may injure myself or himself be-

cause of previous occurrences out in the field. Okay, the instructions were clearly given. The first thing he does is put both hands directly down in his crotch, the location of choice for people out in the street to carry a weapon. Now in direct correspondence with my training, I react. My hand goes up, and I keep him away from [me]. My hand goes for my weapon. I unsnap it, and it starts to come out. Now at this point, this is where we have a problem because I am leaning forward pushing against the wall telling him to get his hands against the wall, "what the hell do you think you're doing?" ... My perception when I was questioned about it, it's in the holster. Yes, it's ready to come out because I am acting accordingly, according to my training, and I'm ready to do whatever is necessary.

On August 21, 1996, Chief Killian ordered Lucas's discharge based on dishonesty, specifically the "untruthful statements" made by Lucas during the course of the internal affairs investigation and during the pretermination hearing. Lucas timely appealed to the Civil Service Commission, which scheduled a hearing on November 19, 1996.

Before that hearing, the Commission heard argument on Murray City's "Motion in Limine" to exclude from the hearing any evidence regarding Lucas's claim of a retaliatory discharge and to exclude witnesses, which Lucas argued would testify in support of this claim. Lucas claimed that Lieutenant Fondaco and Chief Killian's motives for recommending and then ordering his discharge were based on claims of police misconduct he had filed with the Utah Attorney General's office.[1] Without any reasoning, findings, or conclusions, the Commission granted the motion.

*After the hearing on November 19, 1996, the Commission affirmed Chief Killian's deci-*sion to terminate Officer Lucas, finding his statements regarding the use of his weapon both inconsistent and incredible because his statements had "changed substantially" from interview to interview. Officer Lucas appeals the Commission's decision.

## STANDARD OF REVIEW

Our review of the Commission's final order, which affirmed Officer Lucas's discharge from the Department, is limited to "determining if the commission has abused its discretion or exceeded its authority." Utah Code Ann. § 10–3–1012.5 (1996); *Salt Lake City Corp. v. Salt Lake City Civil Serv. Comm'n*, 908 P.2d 871, 874 (Utah Ct.App. 1995).

## ANALYSIS

Lucas challenges on several grounds the Commission's decision to affirm his discharge. Initially, Lucas asserts this case should be remanded to the Commission for a new hearing because the Commission violated his due process rights by: (1) failing to comply with the Department's policy and procedure during Lucas's disciplinary hearing; (2) excluding audiotape evidence required to impeach Spegar's testimony; (3) excluding evidence in support of Lucas's claim of retaliatory discharge; and (4) allowing its legal advisor to participate in the capacity of a commissioner. In addition, Lucas asserts he should be reinstated with back pay because (1) insufficient evidence exists to support the dishonesty charge, and (2) termination is a disproportionate punishment for such a charge.

## I. PROPERTY INTEREST DUE PROCESS ANALYSIS

■ Lucas argues he has a property inter-

---

**1.** Lucas's claim of retaliatory discharge is based on claims of misconduct that he and another officer filed with the Utah Attorney General's office against Lieutenant Fondaco and the Department. According to Lucas, Lieutenant Fondaco often used excessive force against arrestees and was involved in a bid-rigging scheme involving vehicle repair underpricing. These claims, Lucas alleges, "infuriated Chief Killian," who demanded the claims be dropped and demanded to know the identities of the officers making the allegations. According to Lucas and two other witnesses, Chief Killian was aware that Lucas had made the allegations of misconduct. In response, the City provided affidavits from Chief Killian and Lieutenant Fondaco, in which both stated they did not know the identity of the claimants.

est in continued public employment,[2] entitling him to notice and an opportunity to be heard before any deprivation of that interest. The City argues Lucas was afforded due process consistent with that required in Utah Code Ann. § 10–3–1012 (1996) and that any procedural defect was immaterial to the Commission's determination that Lucas's discharge was appropriate. Before addressing the specific due process arguments, we must first determine if Lucas has a property interest in continued public employment, which interest cannot be deprived except pursuant to constitutionally adequate procedures. In addition, we must determine to what process Lucas is entitled.

The Fourteenth Amendment of the United States Constitution provides that no state shall deprive any person of property without due process of law.[3] *See* U.S. Const. amend. XIV, sec. 1. While the Constitution guarantees due process before the deprivation of property interests, such interests are not created by the Constitution. Rather, property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He [or she] must have more than a unilateral expectation of it. He [or she] must, instead, have a legitimate claim of entitlement to it." *Id.*

In *Board of Regents v. Roth,* the United States Supreme Court stated that public employees have a property interest in continued employment if contractual or statutory provisions guarantee continued employment absent "sufficient cause" for discharge. *See id.* at 576–78, 92 S.Ct. at 2708–10. If a property interest in continued employment exists, then the employee is entitled to procedures comporting with the minimum requirements of due process, as provided in the Constitution. *See Cleve-*land Bd. of Educ. v. Loudermill, 470 U.S. 532, 541, 105 S.Ct. 1487, 1492, 84 L.Ed.2d 494 (1985) ("'[M]inimum [procedural] requirements [are] a matter of federal law[;] they are not diminished by the fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action.'" (quoting *Vitek v. Jones,* 445 U.S. 480, 491, 100 S.Ct. 1254, 1263, 63 L.Ed.2d 552 (1980))). If no property interest exists, then the employee must rely solely upon any procedural protections afforded by contract, ordinance, or state statute.

In this case, we look to state law, specifically the Civil Service statute, Utah Code Ann. § 10–3–1012 (1996), to determine whether Lucas has a property interest in continued employment as a police officer absent "sufficient cause" for discharge. Section 10–3–1012 provides, in pertinent part:

> All persons in the classified civil service may be suspended as provided in Section 10–3–912, or removed from office or employment by the head of the department for *misconduct, incompetency, failure to perform his [or her] duties, or failure to observe properly the rules of the department,* but subject to appeal by the suspended or discharged person to the civil service commission .... which shall fully hear and determine the matter.

Utah Code Ann. § 10–3–1012 (1996) (emphasis added). The statute specifically lists the reasons for which a civil service employee may be discharged. The reasons supporting discharge are clearly directed at employee behavior that "is detrimental to the efficiency of the employing agency." *Arnett v. Kennedy,* 416 U.S. 134, 162–63, 94 S.Ct. 1633, 1648–49, 40 L.Ed.2d 15 (1974) (interpreting statute providing for discharge for "such cause as will promote the efficiency of the service" to prohibit discharge "without cause"). This language, with "unmistakable clarity," grants civil service employees security against discharge "without cause," *id.* at 154, 94 S.Ct. at 1644, and thus limits both the department

---

**2.** The Utah Supreme Court has referred to public employment as a property right requiring due process upon discharge. *See Worrall v. Ogden City Fire Dep't,* 616 P.2d 598, 601 (Utah 1980).

**3.** The Utah Constitution guarantees the same protection under article 1, section 7.

head's and the Commission's discretion in making employment decisions. *See Marvin v. King*, 734 F.Supp. 346, 354 (S.D.Ind.1990) (stating Commission cannot base discharge on "arbitrary matter [upon] which employers of at-will employees are free to base their employment decisions"); *Boreen v. Christensen*, 267 Mont. 405, 884 P.2d 761, 767 (1994). Therefore, as a civil service employee, Lucas had a vested right to continued employment absent a legal cause for termination.

## II. PRE–DEPRIVATION & POST–DEPRIVATION DUE PROCESS

■ Because section 10–3–1012 confers upon civil service employees a property interest in continued employment, we must determine what process is due. The essential principle of due process requires that a deprivation of any significant property interest "be *preceded* by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 656–57, 94 L.Ed. 865 (1950) (emphasis added). "An employee's right to fair notice and an opportunity to 'present his [or her] side of the story' before discharge is not a matter of legislative grace, but of 'constitutional guarantee.'" *Loudermill*, 470 U.S. at 541, 105 S.Ct. at 1493. Post-deprivation procedures, while not constitutionally guaranteed, must comport with due process requirements providing for a fair hearing. *See Loudermill*, 470 U.S. at 546, 105 S.Ct. at 1496 (stating due process requires post-termination administrative procedures "at a meaningful time" as provided by statute); *see also Bunnell v.*

*Industrial Comm'n*, 740 P.2d 1331, 1333 (Utah 1987) ("[E]very person who brings a claim in a court or at a hearing held before an administrative agency has a due process right to receive a fair trial in front of a fair tribunal.").

In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), the United States Supreme Court determined what process is due a discharged employee with the right to continued employment. In doing so, the Court balanced the competing interests at stake, including "the private interests in retaining employment, the governmental interest in the expeditious removal of unsatisfactory employees and the avoidance of administrative burdens, and the risk of erroneous termination." *Id.* at 542–43, 105 S.Ct. at 1493; *accord Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). In light of these interests, the Court concluded that before termination, minimum due process entitles an employee to oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to present his or her side of the story in "'something less' than a full evidentiary hearing." *Loudermill*, 470 U.S. at 542, 545, 105 S.Ct. at 1493, 1495 (quoting *Mathews*, 424 U.S. at 343, 96 S.Ct. at 907). In addition, because the Ohio statute, which created the property interest in public employment, also provided for a full post-termination hearing, the *Loudermill* Court also determined that due process in that case required a full, timely post-termination hearing.[4]

---

4. As the Utah Supreme Court has stated:

Due process is not a technical conception with a fixed content unrelated to time, place, and circumstances; it is flexible and requires such procedural protections as the particular situation demands. In an analysis of a procedure, an important factor is the risk of an erroneous deprivation of a private interest through the procedures, and the probable value, if any, of additional or substitute procedural safeguards. *Worrall*, 616 P.2d at 602. The *Loudermill* Court also recognized the flexibility of due process, stating that the existence of post-termination procedures is relevant to the necessary scope of pretermination procedures. The Court stated that in some instances, a post-deprivation hearing will satisfy due process requirements. *See*

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 n. 7, 105 S.Ct. 1487, 1493 n. 7, 84 L.Ed.2d 494 (1985). And, in some instances, as *Loudermill* establishes, both pretermination and post-termination procedures are required. However, Justice Marshall emphasized in his concurrence in *Loudermill* that due process requires more, in that, before a decision is made to terminate employment, an employee should be entitled to test the strength of the evidence by confronting and cross-examining adverse witnesses. *See id.* at 548–49, 105 S.Ct. at 1496–97 (Marshall, J., concurring). He argued that better pretermination procedures would ensure against the risk of an erroneous deprivation, resulting in lost wages and undue delay. *See id.* at 549, 105 S.Ct. at 1497 (Marshall, J., concurring). However, al-

Applying *Loudermill,* we conclude that under both the Fourteenth Amendment and the provision in section 10–3–1012 for a post-termination hearing, Lucas is entitled to due process by way of oral or written notice of the charges, an explanation of the employer's evidence, an opportunity to respond to the charges in "something less" than a full evidentiary hearing before termination, coupled with a full post-termination hearing "at a meaningful time." *Loudermill,* 470 U.S. at 546–47, 105 S.Ct. at 1495–96; *see also Mondt v. Cheyenne Police Dep't,* 924 P.2d 70, 82 (Wyo.1996) (requiring full evidentiary hearing and examination of witnesses as provided by statute). It is a clear abuse of discretion for the Commission to exercise its discretion in such a way as to deny due process to a party appearing before it. *See Tolman v. Salt Lake County Attorney,* 818 P.2d 23, 28 (Utah Ct.App.1991).

We therefore address Lucas's due process arguments in light of both constitutionally and statutorily required pre- and post-termination due process procedures.

### A. City's Failure to Comply with Its Rules and Regulations in Course of Disciplinary Action

■ Pretermination due process requires notice of the charges, an explanation of the evidence, and an opportunity to respond. To give effect to these constitutional protections, public agencies such as the Department and the Commission promulgate rules and regulations governing disciplinary procedures. "In disciplinary proceedings, a public body must comply with its own rules and an employee being disciplined is entitled to rely upon those rules." *Bell v. Civil Serv. Comm'n,* 161 Ill.App.3d 644, 113 Ill.Dec. 439, 443, 515 N.E.2d 248, 252 (1987). Lucas asserts that the Department deprived him of due process by failing to comply with its own procedures that limit the time to conduct an internal affairs investigation and that provide for written notice of the allegations. *See Worrall,* 616 P.2d at 601, 602 (stating officer had property interest in continued employ-

ment requiring due process through established guidelines to terminate that employment).

■ First, Murray City Police Department Policy 555, III(E) requires the Department complete internal affairs investigations within thirty days. The record shows that the investigation here lasted about forty-six days, violating Department policy. However, beyond merely asserting that a delay occurred, Lucas reveals nothing about the delay and fails to provide any evidence that the delay was unreasonably prolonged. A mere delay alone in conducting an internal affairs investigation does not rise to the level of a constitutional violation per se. *See, e.g., Loudermill,* 470 U.S. at 547, 105 S.Ct. at 1496 (holding that nine-month delay in post-termination hearing is not unconstitutionally lengthy per se).

■ Second, Murray City Police Department Policy 555, III(G) requires that "[p]rior to any interview of an accused member as part of an Internal Affairs Investigation, the member will be given written notification of the allegations, and their rights and responsibilities relative to the investigation." Lucas argues he received inadequate notice of the charges against him in that before his initial interview, he was not informed or given written notice of the excessive force investigation, and, when the investigation changed focus to dishonesty, he was not told orally or in writing.

Although the record shows the Department failed to strictly comply with its procedure, the fundamental requirements of due process were met. Lucas did not receive written notice of either allegations of excessive force or dishonesty; however the record shows that Lucas did in fact have notice of the pending charges and was able to respond to the charges before the termination was implemented. First, although hesitantly, Lieutenant Fondaco told Lucas that the initial interview was based on an allegation of excessive force and, during the interview, Lieutenant Fondaco read Spegar's written

though arguing due process should provide more protection before termination, Justice Marshall concurred to the extent the parties in *Loudermill*

requested only notice and an opportunity to be heard. *See id.* at 548, 105 S.Ct. at 1496 (Marshall, J., concurring).

statement to Lucas. Second, the transcript of Lucas's polygraph test interview clearly shows Lucas's knowledge of Spegar's complaint and Officer Snow's statement. In fact, Lucas repeatedly clarified that his original statement was not "dishonest" and that he "does not lie." Third, prior to termination, Lucas was formally notified in writing of the charges against him. And, finally, he was afforded a pretermination hearing in which he specifically addressed each charge and the evidence against him.

Furthermore, Lucas fails to establish how these procedural errors were harmful, e.g., he did not have time to prepare for the hearing or, how these procedures would have resulted in a different outcome absent such errors. *See, e.g., Loudermill,* 470 U.S. at 547, 105 S.Ct. at 1496; *cf. State v. Knight,* 734 P.2d 913, 920 (Utah 1987) ("[T]he likelihood of a different outcome must be sufficiently high to undermine confidence in [the decision]."); *State v. Villarreal,* 857 P.2d 949, 958 (Utah Ct.App.1993) (stating evidence must be "sufficiently inconsequential that we conclude there is no 'reasonable likelihood that the error affected the outcome of the proceedings'" (quoting *State v. Verde,* 770 P.2d 116, 120 (Utah 1989)), *aff'd,* 889 P.2d 419 (Utah 1995)). Under the facts of this case, we cannot say that Lucas was denied due process when the record shows that Lucas had actual notice of the excessive force and dishonesty charges, received written notice of the charges against him, and had a pretermination opportunity to respond to the charges.

### B. Commission's Exclusion of Retaliatory Discharge Evidence

■ Lucas argues the Commission failed to provide him with a full and fair post-termination hearing by excluding evidence supporting his theory of retaliatory discharge. Before Lucas's post-termination hearing, the Department moved to exclude all evidence supporting his claim that his discharge was based on Lieutenant Fondaco's and Chief Killian's alleged bias and retaliatory motives. The Commission, without making any findings or providing any reasoning, granted the Department's motion.

■ Lucas challenges the exclusion of the retaliatory discharge evidence, arguing that the Commission erred in excluding evidence of Lieutenant Fondaco's and Chief Killian's alleged biases and retaliatory motives, which Lucas claims are admissible under Rule 608 of the Utah Rules of Evidence and Utah Code Ann. § 78-24-1 (1996).[5] The City counters by arguing such evidence was irrelevant and immaterial to the Commission's limited inquiry—whether Lucas was dishonest, and whether the charge of dishonesty warranted Lucas's discharge.

.■ Before addressing Lucas's argument, we recognize that the Civil Service Commission is a local, municipal tribunal of limited jurisdiction. *See Piercey v. Civil Serv. Comm'n,* 116 Utah 135, 141, 208 P.2d 1123, 1125-26 (1949); *Salt Lake City Corp.,* 908 P.2d at 875. The Commission is neither a court of law nor a state administrative agency subject to the Utah Administrative Procedures Act (UAPA). *See Tolman,* 818 P.2d at 26 n. 3 (stating UAPA only applies to state, not local, agency action). In addition, as a municipal administrative body, the Commission is not bound by formal rules of evidence and procedure. *See Murray City Civil Service Commission, Rules and Regulations* 13-10 (1996) ("At all hearings the Commis-

---

5. Lucas also argues that the Commission erred in granting the City's motion to exclude the evidence without giving any reasoning and without making any findings or conclusions to support its decision. This court has emphasized that an administrative agency must make findings of fact that are sufficiently detailed so as to permit meaningful appellate review. *See Adams v. Board of Review of Indus. Comm'n,* 821 P.2d 1, 4 (Utah Ct.App.1991). For us to meaningfully review the Board's findings, the findings must be " ' "sufficiently detailed and include enough subsidiary facts to disclose the steps by which the ultimate conclusion on each factual issue was reached".... The failure of an agency to make adequate findings of fact in material issues renders its findings "arbitrary and capricious" unless the evidence is "clear, uncontroverted and capable of only one conclusion." ' " *Id.* at 4-5 (quoting *Nyrehn v. Industrial Comm'n,* 800 P.2d 330, 335 (Utah Ct.App.1990) (citations omitted)). In this case, the Commission's decision granting Murray City's Motion in Limine without providing any findings, conclusions, or reasoning was arbitrary and capricious. Therefore, the Commission abused its discretion.

sion will determine the admissibility of evidence and shall use as near as it deems practicable the rules of evidence followed in the Courts in this State."); *cf. Pilcher v. State Dep't. of Soc. Servs.*, 663 P.2d 450, 453 (Utah 1983) ("Administrative proceedings are usually conducted with greater flexibility and informality than judicial proceedings[, thus,] [r]igid adherence to judicial procedures in administrative proceedings is generally inappropriate because it ignores basic differences between judicial and administrative procedures.").

■■■■ However, although the Commission is not bound by formal rules of evidence and procedure, it is not above the law. *See Tolman*, 818 P.2d at 31. In the absence of formal legal rules, the Commission must "determine what evidence should, in 'fairness,' be admitted." *Id.* The evidence must be legally relevant, in that it has " 'some probative weight and reliability.' " *Id.* (citation omitted). "Whether certain evidence is relevant ... is a question of law, which we review under a correction-of-error standard." *State v. Gonzalez*, 822 P.2d 1214, 1216 (Utah Ct.App.1991).

In this case, evidence relating to Chief Killian's and Lieutenant Fondaco's credibility, i.e., evidence of bias and retaliatory motives, is relevant and material to the Commission's review of Chief Killian's decision to discharge Lucas. Lucas argues that Chief Killian's decision and Lieutenant Fondaco's recommendation to discharge him were based on retaliation. It is widely recognized that an employer's motive is a key element of retaliatory discharge. *See Lihosit v. I & W, Inc.*, 121 N.M. 455, 913 P.2d 262, 265 (N.M.Ct.App.1996). Moreover, under both the Utah Rules of Evidence and Utah law, evidence of a witness's motive or bias is admissible to challenge that witness's credibility.

■■■ Rule 608(c) of the Utah Rules of Evidence provides that "[b]ias, prejudice or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by evidence otherwise adduced." Similarly, Utah Code Ann. § 78–24–1 (1996), states that

in every case[,] the credibility of the witness may be drawn into question, by the manner in which he [or she] testifies, by the character of his [or her] testimony, or by evidence affecting his [or her] character for truth, honesty or integrity, or by his [or her] motives, or by contradictory evidence.

Utah case law supports the well established principle that testimony reflecting on the bias and motives of a witness is admissible at trial. *See Ong Int'l (U.S.A.) Inc. v. 11th Ave. Corp.*, 850 P.2d 447, 459 (Utah 1993); *State v. Hackford*, 737 P.2d 200, 203 (Utah 1987); *State v. Leonard*, 707 P.2d 650, 656 (Utah 1985); *State v. Patterson*, 656 P.2d 438, 438 (Utah 1982). Although the Commission is not bound by formal rules, due process requires that in a full post-termination hearing, an employee be given an opportunity to introduce evidence and cross-examine witnesses, which includes challenging witness credibility. *See Post v. Harper*, 980 F.2d 491, 493 (8th Cir.1992).

In this case, the Commission's role is limited to either affirming or reversing the *Chief's* decision to terminate Lucas, a decision based in part on Lieutenant Fondaco's recommendation. The Commission relied on the testimonies of Chief Killian, Lieutenant Fondaco, and Martin Spegar in reaching its decision to affirm the Chief's discharge order. The excluded evidence of Chief Killian's and Lieutenant Fondaco's intent, bias, and motives directly relates to their credibility. The Commission's exclusion of the retaliatory discharge evidence prevented Lucas from challenging the credibility of two primary witnesses. In addition, the Commission's failure to consider evidence challenging Chief Killian's credibility effectively prevented the Commission from properly reviewing the Chief's decision to terminate Lucas. *See Tolman*, 818 P.2d at 32 (holding County Career Services Council's failure to consider terminated employee's legal contentions prevented fair review of county attorney's decision to terminate employee). Therefore, the Commission erred in excluding Lucas's evidence of retaliatory discharge because that evidence was relevant to Chief Killian's credibility and to the Commission's review of the Chief's decision. *See Rousay v. Board of*

*Review of Indus. Comm'n,* 748 P.2d 569, 572 (Utah 1987) (holding Commission erred in excluding critically relevant and material testimony).

 Murray City, however, argues that even if the Commission erred in excluding the evidence regarding Lucas's claim of retaliatory discharge, the error was harmless. Murray City correctly notes that "[a]n erroneous decision to admit or exclude evidence does not constitute reversible error unless the error is harmful." *Cal Wadsworth Constr. v. St. George,* 898 P.2d 1372, 1378 (Utah 1995). However, as stated above, the evidence Lucas proffered directly relates to the credibility of Chief Killian and Lieutenant Fondaco, two of the three witnesses whose testimony the Commission relied upon in reaching its decision. In addition, because the Commission is limited to either affirming or reversing the Chief's decision, his credibility, motives, and bias are directly at issue. Had the Commission heard the retaliatory discharge evidence, there is a substantial likelihood of a different outcome sufficient to undermine our confidence in the Commission's decision to affirm Lucas's discharge. *See Harline v. Barker,* 912 P.2d 433, 442 (Utah 1996).

Thus, because the credibility of both Lieutenant Fondaco and Chief Killian is directly relevant and material to the Commission's fair evaluation of the Chief's decision to terminate Lucas, the Commission erred in excluding the evidence supporting Lucas's claim of retaliatory discharge. The Commission thereby violated Lucas's right to due process in excluding the evidence of retaliatory discharge and preventing Lucas from effectively challenging witness credibility.

### C. Commission's Exclusion of Audiotape for Impeachment Purposes

 During the tape-recorded polygraph interview, Spegar acknowledged that he could have been mistaken as to the placement of Lucas's gun, stating the gun could have been pointed at his head, his torso, or down at the floor. However, during cross-examination at the post-termination hearing, Spegar denied making that statement and testified that he knew the gun was pointed directly at him. Lucas attempted to impeach Spegar by playing the tape-recording of Spegar's polygraph interview. The Commission, however, via its legal advisor's sua sponte ruling, excluded the audiotape for lack of foundation, concluding that Spegar could not authenticate his own voice.

We agree the Commission may have erred in excluding the audiotape evidence for lack of foundation. *See* Utah R. Evid. 901(b)(5) (allowing party to authenticate own voice); *see, e.g., People v. Williams,* 16 Cal.4th 635, 66 Cal.Rptr.2d 573, 589, 941 P.2d 752, 768 (1997) (stating audiotape admissible upon detective's testimony that he was party to recorded conversation). However, the Commission did not prevent Lucas from impeaching Spegar. Lucas had access to, but failed to avail himself of, other means available to impeach Spegar at the time he testified, e.g., the transcribed copy of the polygraph interview. The transcription was later admitted into evidence, but never used to impeach Spegar. Therefore, the error was harmless. *See State v. Knight,* 734 P.2d 913, 920 (Utah 1987); *accord Villarreal,* 857 P.2d at 957–58.

### D. Commission's Authority to Allow Legal Advisor's Active Participation

 Lucas argues that the Commission exceeded its statutorily limited authority in allowing its legal advisor to actively participate, question, and make sua sponte rulings as to the admissibility of evidence during the hearing. We disagree. There is nothing in either the statute creating the Commission's authority, Utah Code Ann. §§ 10–3–1001 to –1013 (1996), or the Murray City Civil Service Commission's Rules and Regulations to preclude or limit the Commission's use of a legal advisor. Further, because the Commission must deal with both evidentiary rules and legal issues, advice from independent legal counsel may in many cases be necessary. A conflict would arise if the Commission's legal advisor simultaneously served as both an advocate and an advisor. *See Hamilton v. City of Mesa,* 185 Ariz. 420, 916 P.2d 1136, 1143 (Ariz.Ct.App.1995). However, absent a showing of any actual bias or partiality, there is no due process violation. *See, e.g., id.*

(holding city manager seeking advice from independent legal advisor, absent showing of actual bias or partiality, insufficient to establish due process violation). In this case, the Commission did not exceed its authority by either deferring to the independent advisor's legal advice or acquiescing to the advisor's active participation in the hearing. The ultimate responsibility for all these matters rests with the Commission, and it is at liberty to rely upon the advice of its chosen legal advisor.

### III. COMMISSION'S REVIEW OF CHIEF'S DECISION

■ Section 10-3-1012 states the Commission "shall fully hear and determine" appeals of suspension or termination brought by civil service employees. The Utah Supreme Court, in *Vetterli v. Civil Service Commission*, 106 Utah 83, 145 P.2d 792 (1944), established that the Commission's review of disciplinary decisions involves two inquiries: (1) do the facts support the charges made by the department head, and, if so, (2) do the charges warrant the sanction imposed? *See id.*, 145 P.2d at 796; *In re Discharge of Jones*, 720 P.2d 1356, 1361 (Utah 1986). If the Commission answers no to either of these inquiries, it must reverse the department head's actions.

### A. Factual Basis for Dishonesty Charge

■ We first address whether the facts support the charge of dishonesty. In addressing this issue, we must determine the appropriate standard of review to be applied to the Commission's findings. As stated above, the Commission is a local, municipal agency regulating employment in the police, fire, and health departments; it monitors hiring, promotion, suspension, and termination in those city agencies. *See* Utah Code Ann. §§ 10-3-1001 to -1011 (1996); *accord Salt Lake City Corp.*, 908 P.2d at 875. The Commission also hears appeals from department heads' suspension and termination decisions. *See* Utah Code. Ann. §§ 10-3-1012 to -1012.5 (1996). Although the Commission is not subject to UAPA, it functions similarly to such state administrative agencies as the Career Service Review Board. *See, e.g.,*

*Kent v. Department of Employment Sec.*, 860 P.2d 984, 985 (Utah Ct.App.1993) (stating sole purpose of Career Service Review Board is reviewing agency decisions regarding career service employees). Therefore, we adopt and apply the "substantial evidence" standard applicable to a state administrative agency's findings of fact.

■ The Commission's findings, upon which the charges are based, must be supported by substantial evidence viewed in light of the whole record before us. *See Larson Limestone Co. v. State*, 903 P.2d 429, 430 (Utah 1995). Substantial evidence " 'is that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion.' " *Id.* (quoting *First Nat'l Bank v. County Bd. of Equalization*, 799 P.2d 1163, 1165 (Utah 1990)); *see also A.M.L. v. Department of Health*, 863 P.2d 44, 47 (Utah.Ct.App.1993) (stating evidence is not substantial if overwhelmed by other evidence or based on mere conclusion). It is more than a mere " 'scintilla' of evidence and something less than the weight of the evidence." *Johnson v. Board of Review of Indus. Comm'n*, 842 P.2d 910, 911 (Utah.Ct.App.1992) (citation omitted). We do not review the Commission's findings de novo or reweigh the evidence. *See Larson Limestone*, 903 P.2d at 431. Instead, we defer to the Commission's findings on issues of credibility.

Based on our examination of the whole record, we cannot say the Commission's finding that Lucas lied about his gun's position is supported by substantial, competent evidence. Initially, we note that the allegation of dishonesty arose from, as Murray City acknowledged in its brief, an unsubstantiated claim of excessive force. The internal affairs investigation into Lucas's use of excessive force was never completed and never ruled upon by the Commission. In addition, the evidence presented in support of the excessive force charge was inconsistent and uncorroborated. For instance, Spegar, who is the only eyewitness to Lucas's alleged use of excessive force, gave many inconsistent statements regarding the circumstances sur-

rounding his arrest and subsequent search.[6] Particularly questionable are Spegar's statements that Lucas's gun could have been pointed at his head, his torso, below his waist, or at the ground. At the hearing, Spegar testified that although he "didn't look over at [Lucas]," he "knew" the gun was pointed at him, but he could not "justify whether it was at [his] head or not." In addition, Spegar's claim that Lucas threatened to "blow his brains all over the wall" was allegedly corroborated by Garcia who testified to hearing the threat in the interview room approximately twenty to thirty feet away from Spegar. However, Hamblin, who was detained in the office next to Spegar, and Officer Snow, who had just left Garcia in the interview room and was en route to take Spegar's statement, heard nothing.

In addition, the Commission heard and relied upon the statements of Chief Killian and Lieutenant Fondaco, the credibility of whom Lucas was prevented from challenging. The post-termination hearing transcript shows that Lieutenant Fondaco's and Chief Killian's testimony on the dishonesty issue was largely conclusory and speculative as they testified mainly regarding their perceptions of the evidence. For example, without any proof, and contrary to the testimony of the only eyewitness, Chief Killian testified that "I know [the gun] wasn't two inches from the holster," and Lieutenant Fondaco testified that "I am of the firm belief that Officer Lucas took his gun out of his holster, pointed it at Marty Spegar and then denied that fact to me in an internal affairs investigation."

In support of the charge of dishonesty, the Commission relied primarily upon its finding that Lucas lied about his gun's position dur-

ing his search of Spegar. Specifically, the Commission found "Officer Lucas's statements regarding the holstering and unholstering of his weapon to be inconsistent and not credible[, and to have] ... changed substantially in subsequent interviews from the statement initially given Lieutenant Fondaco." The Commission based its finding upon Lucas's three transcribed interviews and his testimony given during the post-termination hearing.

Contrary to the Commission's finding, Lucas's statements regarding the events surrounding Spegar's arrest, his subsequent search, and the position of Lucas's gun, whether holstered or unholstered, were consistent. The transcripts of Lucas's interviews and hearing testimony reveal that he clearly and consistently maintained that he perceived his gun to be holstered, but recognized the possibility his gun could have been unholstered and pointed at the floor, as witnessed by a fellow officer.

The evidence shows that the internal affairs investigation of Lucas began with an allegation of excessive force. In a written statement, Spegar alleged:

> [Officer Lucas] told me to stand up and empty my pockets onto the table, and also to take off my hat. He then asked me to wait before I did it. He [illegible] for a minute and took out his gun from his holster and pointed it in the direction of my head. He was standing about 3 feet away from me. He then [said,] "I dare you to pull out a gun because if you do I swear that I will ... kill you," and that my brains will be splattered on the wall!

Based on this allegation, Lieutenant Fondaco initiated the internal affairs investigation. In the first of three interviews, Lieutenant Fondaco read the above allegation to Lucas and

6. Spegar gave four statements regarding the allegation of excessive force—the written statement sent along with the claim of excessive force, the oral interview with Lieutenant Fondaco, Spegar's transcribed answers from the polygraph test, and his testimony at Lucas's post-termination hearing. Reviewing the record, Spegar's statements—particularly those describing his searches, the gun's placement, his demeanor, and exactly when he discussed the incident with his friends—vary from one statement to the next and are inconsistent as a whole. For instance, at

the hearing, Spegar for the first time related that he had been searched up against the wall before Lucas pulled out his gun; he stated that he was both thoroughly and cursorily searched at the scene of the arrest; that he had nothing in his pockets when Lucas searched him at the station, although Officer Snow testified that he saw several items, including pliers, emptied from his pocket; that the gun was both pointed at his head and that it was not, that he did not remember where the gun was, and that it was just pointed in his general direction or at his waist.

asked "Is any of that true?" The following is the exchanged dialogue.

> LUCAS: The part that I had searched him, yes it is. And when I went to search him, he took his other hand, and he was going right down, he had baggies on you know. And he hadn't been adequately searched yet. He went right down to his crotch so I unsnapped my gun and said "don't do that." So then I put him against the wall and I searched him. But as far as that other crap, no.
>
> FONDACO: Okay. So, you unsnapped your gun, put him against the wall and searched him, but you never took your gun out of the holster.
>
> LUCAS: No, I unsnapped it you know because I didn't know what he was doing. As soon as his hand came out, you know that was it. It was done. I put him against the wall and I searched his crotch real good you know. I said "what the heck are you doing." . . . a scratch. I said, well that's pretty stupid, you know. I'm here searching you for weapons and stuff and you put your hand down your pants, you know. He said, yeah that was pretty stupid.
>
> FONDACO: So, I just want to make sure I'm right. You unsnapped your weapon, left it in the holster, then put him on the wall, patted him down again, and then had him empty his pockets, but your weapon never came out of the holster. You never pointed your weapon at him? You never pointed your weapon at his head?
>
> LUCAS: No.
>
> FONDACO: You never threatened to kill him?
>
> LUCAS: No.

Shortly after, Officer Snow gave a written statement, in which he acknowledged seeing Lucas with his gun out of its holster, at his side, pointing down at the ground. Lucas was interviewed a second time, in conjunction with a polygraph test he agreed to take, and a third time, by Chief Killian in Lucas's pretermination interview. In both interviews, Lucas's version of the events surrounding Spegar's arrest and subsequent search remained consistent. In both interviews, Lucas acknowledged the possibility that his gun could have been unholstered and pointed at the floor. However, consistent with his original interview, he repeatedly stated that he perceived his gun had been holstered.

In his second interview, Lucas stated:

> . . . I had my hand on him. Had my weapon unsnapped, and I was leaning forward. I'm not looking down at my gun to see exactly where it is you know. In hindsight maybe the officer walking by, he said my gun was out and pointed down. That's understandable. He may have seen it. It is possible because when I'm leaning forward, I'm not paying attention over there . . . .
>
> Like I said, I had it unsnapped, I had a full grasp on it, leaning on him, leaning forward as he went to the wall. In my perception and I asked about it, is all I did is grab [my gun], but you know in hindsight, if I'm leaning forward and my adrenalin is up and I got my gun uncocked as you will, it [could] likely come out. Then I get another officer who I have never known to be deceptive saying that he saw it clear leather, and I told him to always be honest, and if that's what he saw, that's what he saw and to stick with it because I have nothing to hide. And I don't.
>
> . . . .
>
> But, whenever I was asked about it, I said it was in my holster, and that's my perception. Now I'm getting information contrary to that so it makes me think, now I have doubts.

During his pretermination interview, Lucas stated:

> [W]hen I was interviewed [by] Lieutenant Fondaco, I clearly told him that the gun didn't come out of the holster. It was in my holster, unsnapped. I'm leaning forward, pushing this guy away from me, so I'm leaning away, and my gun is in and out, sliding up and down. It could have been beside me, it could have been pointing at the floor. My perception was it was in the holster. But, now I have an officer who says he walks by and sees it pointed at the floor, okay. I'm not real clear on that, okay.

. . . .

I was sure it didn't come out of the holster. Then the other parameters are introduced. Is it possible? Yes, it is possible. Am I sure? No, I'm not sure. It could be possible because my focus is on this son of a gun now that's toying with me, not on [the exact placement of my gun] by two or three inches.

Finally, during the post-termination hearing, Lucas testified at length that he believed then and now that his gun was holstered. Lucas stated,

I told him that when I was interviewed by Lieutenant Fondaco, I told him that I was 100 percent sure that my gun never left my holster. When I came out of the interview and met with Officer Snow, Officer Snow told me that he saw me with my gun pointed to the floor. At that point, I had doubts.

Lucas clearly testified that to his knowledge, his gun was holstered. However, he recognized that Snow's statement raised doubts in his mind about his own perception of his gun's position.

Based on our review of the record, Spegar's inconsistent statements regarding the placement of Lucas's gun—pointed at his head, torso, or the floor, the unsubstantiated allegation of excessive force, Officer Snow's statement that he did not see Lucas's gun pointed at Spegar, combined with Lucas's statements, the Commission's finding that Lucas lied is not supported by substantial evidence. However, even if we were to assume that Lucas lied about the position of his gun—holstered or unholstered and pointed at the ground—dismissal for the charge of dishonesty under these circumstances is neither compelled nor supported by the record.

### B. Termination Disproportionate to Charge

 Lucas argues that, under the facts of this case and in light of his outstanding service record, termination is an excessive disciplinary action for his alleged offense. In determining whether the charges warrant the disciplinary action taken, we acknowledge that discipline imposed for employee misconduct is within the sound discretion of the Chief. *See In re Discharge of Jones,* 720 P.2d at 1363 (stating Chief must manage and direct his officers, and thus is in best position to know whether their actions merit discipline). This discretion is abused, however, if the punishment exceeds the range of sanctions permitted by statute or regulation, or if, in light of all the circumstances, the punishment is disproportionate to the offense. *See id.; see also Boyce v. United States,* 211 Ct.Cl. 57, 543 F.2d 1290, 1295 (1976) (" 'If a penalty is so harsh as to constitute an abuse, rather than an exercise of discretion, it cannot be allowed to stand.' " (citations omitted)).

 Initially, Lucas argues that the Chief and the Commission abused their discretion by violating the policy and procedure requiring progressive discipline and imposing a punishment exceeding that permitted under the rules and regulations. Section 11–1 of the Murray City Civil Service Commission's Rules and Regulations, provides, in pertinent part:

Basic responsibility for discipline is vested in the appointing power of each department and not in either the Civil Service Commission or the Mayor. Progressive discipline which normally involves a verbal reprimand, written reprimand, suspension and termination shall be administered fairly and consistently by the appointing power. Severity of the offense will determine the steps required for progressive discipline.

Murray City Civil Service Commission Rules and Regulations, § 11–1 (1996). Clearly, Murray City adheres to a progressive discipline policy; however, the rule does not mandate the use of progressive discipline in every situation.

The Nebraska Supreme Court in *Percival v. Department of Correctional Services,* 233 Neb. 508, 446 N.W.2d 211 (1989), interpreted a rule similar to the one in this case and held that the use of progressive discipline is discretionary with the department director. In *Percival,* the State Personnel Board demoted and transferred an employee within the Department of Correctional Services. *See id.,* 446 N.W.2d at 212. The employee argued

that the degree of discipline imposed was contrary to the state's policy of progressive discipline. *See id.* at 213. Nebraska's personnel rules and regulations provided that "disciplinary actions are prescribed in a progressive manner[;] however, the nature and severity of the violation will dictate the level of discipline imposed." *Id.* The rule recommended the department's use of progressive discipline, except where an employee commits an offense of "serious magnitude." *Id.* The court interpreted this provision, which is similar to the rule applicable to this case, as giving the department director discretion in implementing the steps of progressive discipline. *See id.; see also Brougham v. City of Normandy,* 812 S.W.2d 919, 924 (Mo.Ct.App. 1991) (interpreting ordinance adhering to principles of progressive discipline to be guide rather than mandate); *Battiste v. Department of Soc. Servs.,* 154 Mich.App. 486, 398 N.W.2d 447, 450 (1986) ("Progressive discipline may be utilized at the discretion of the commission ... where an agency is given discretion to 'suspend or dismiss' an employee 'for cause.'"). We follow the *Percival* court's reasoning and hold that the use of progressive discipline is committed to the Chief's discretion, based on the Chief's determination of the severity of the offense.

Moreover, under the Murray City Police Department Policies and Procedures, § 555, IX (A), an officer may be disciplined, which includes termination, for untruthfulness in an internal affairs investigation. Under the Department's stated policies, the Chief may impose a range of punishment from reprimand to termination for the charge of dishonesty. We agree with Murray City's statement that police officers are "in a position of trust" and are thus "held to the highest standards of behavior." *Paulino v. Civil Serv. Comm'n,* 175 Cal.App.3d 962, 221 Cal.Rptr. 90, 96 (1985). "[H]onesty and credibility are crucial to [an officer's] proper performance of his [or her] duties." *Id.; see also Ackerman v. California State Personnel Bd.,* 145 Cal.App.3d 395, 193 Cal.Rptr. 190, 193 (1983) ("'Dishonesty in such matters of public trust is intolerable.'" (citation omitted)). As such, under the Department's rules and regulations, the Chief has discretion to order termination

rather than progressive discipline in cases involving dishonesty.

■ Both the Commission's and the Department's rules, however, require that any discipline be administered fairly and consistently. *See* Murray City Service Commission's Rules and Regulation, Section 11–1 (1996); *see also* Murray City Police Department Policies and Procedures, § 520, I (reiterating policy that "like penalties be imposed for like offenses"). The record reveals that in only one other case has an officer been discharged for dishonesty. In that case, the officer, with two-and-one-half years of experience, falsified police reports, falsified worker's compensation claims, falsified property reports, and damaged City property to cover the lies. However, in the two other cases involving the sole charge of dishonesty, one officer was suspended for one day, and the other officer was suspended for two weeks.

In light of all the circumstances, we conclude that, even assuming that Lucas was dishonest regarding the placement of his gun—holstered or unholstered—termination is so disproportionate to the charge that it amounts to an abuse of the Chief's discretion. First, the dishonesty charge was based on an unsubstantiated claim of excessive force—which never conclusively determined the placement of Lucas's gun. Second, the evidence supporting the dishonesty charge was slim and inconsistent. Third, the record shows that other officers disciplined solely for dishonesty were suspended rather than discharged. Finally, Lucas's service record is exemplary. Lucas has served as a Murray City police officer for twelve years. During that time, Lucas's record shows that he had at all times met or exceeded the Department's expectations, and, based on the comments in the service record, Lucas was considered an excellent officer. According to Lucas's record, there is no evidence of any oral or written reprimands, warnings, or disciplinary action taken against him. To the contrary, the record shows that Lucas is the only Murray City police officer to have received the Merit of Honor award.

Even assuming that Lucas was dishonest about the position of his gun, termination was so disproportionate under the facts of

this case to the charge of dishonesty that it amounted to an abuse of the Chief's discretion. Therefore, the Commission abused its discretion in affirming the Chief's decision ordering that Lucas be terminated.

### CONCLUSION

Under Utah Code Ann. § 10–3–1012, a civil service employee has a vested property interest in continued employment absent sufficient cause for discharge. Therefore, before termination, a civil service employee is entitled to due process requiring oral or written notice of the charges, an explanation of the employer's evidence, an opportunity to respond to the charges in "something less" than a full evidentiary hearing before termination, coupled with a full post-termination hearing "at a meaningful time."

We conclude that Lucas's due process rights were not violated by the delay in the internal affairs investigation, the lack of written notice of the allegations where Lucas had actual notice, the exclusion of the audiotape evidence for impeachment purposes, or the Commission's use of a legal advisor. However, because evidence supporting Lucas's retaliatory discharge claim was directly relevant and material to Chief Killian's and Lieutenant Fondaco's credibility and was required for the Commission's proper review of Chief Killian's decision, the Commission's exclusion of such evidence violated Lucas's due process right to a full and fair hearing.

In addition, we conclude the Commission abused its discretion in affirming Chief Killian's decision to discharge Officer Lucas. First, the Commission's finding that Officer Lucas was dishonest was not supported by substantial evidence. Second, even if the evidence supported such a finding, termination is so disproportionate to the charge of dishonesty under the facts of this case as to amount to an abuse of the Chief's discretion.

The decision of the Commission upholding Chief Killian's termination of Officer Lucas is reversed. Officer Lucas is reinstated with back pay.

DAVIS, P.J., concurs.

BENCH, Judge (concurring in the result):

I fully concur with the analysis captioned "Factual Basis for Dishonesty Charge" in section III of the main opinion. As set forth therein, the evidence simply does not support the Commission's finding that Lucas lied about the position of his gun when he searched Spegar at the station. That discussion being dispositive, I would not opine about other aspects of the case.

As recognized by the main opinion, Lucas asks alternatively for reinstatement or a new hearing. He first contends that the Commission should be reversed and that he should be reinstated with back pay because the facts do not support termination for the dishonesty charge and, in any event, termination is disproportionate to the charge. As an alternative argument, he contends that he is entitled to another hearing because his rights to due process were violated.

I share some of the main opinion's concerns over whether Lucas was afforded due process at the hearing before the Commission. I am particularly bothered by the Commission's exclusion of evidence that Lucas was discharged out of retaliation for having filed misconduct claims against Lieutenant Fondaco and the Murray City Police Department. However, given our decision to reinstate Lucas without any further hearing, the discussions about due process and proportionality are mere dicta, which may or may not be correct.

I therefore concur only in the result.