IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| Stewart Becker, | ) | MEMORANDUM DECISION |
| | ) | |
| Petitioner, | ) | Case No. 20100725-CA |
| | ) | |
| v. | ) | F I L E D |
| | ) | (April 5, 2012) |
| Sunset City, | ) | |
| | ) | 2012 UT App 99 |
| Respondent. | ) | |

-----

Original Proceeding in this Court

Attorneys:     Jerrald D. Conder, Salt Lake City, for Petitioner
               Gary L. Johnson and Kallie A. Smith, Salt Lake City; and Felshaw King,
               Kaysville, for Respondent

-----

Before Judges Voros, Thorne, and Roth.

ROTH, Judge:

¶1     Stewart Becker seeks judicial review of the decision by the Sunset City Appeal Board (the Board) to uphold his termination from the Sunset City Police Department. First, he asserts that the Board based its conclusion that he reported to work while under the influence of alcohol on an unreliable and inadmissible Portable Breath Test (the PBT). He also contends that, in the absence of the PBT, there is not substantial evidence in the record to support the termination. He seeks an order of reversal and reinstatement of his employment with back pay and benefits. We decline to disturb the Board's decision.

¶2     When presented with a challenge to a municipal appeal board's termination decision, our review is limited to determining whether the appeal board abused its discretion or exceeded its authority. *See* Utah Code Ann. § 10-3-1106(6)(c) (Supp. 2011)[1] ("The Court of Appeals' review shall be on the record of the appeal board and for the purpose of determining if the appeal board abused its discretion or exceeded its authority."). A municipal appeal board does not abuse its discretion if its determination that an employee has engaged in the behavior with which the city charged him is supported by substantial evidence. *See Lucas v. Murray City Civil Serv. Comm'n*, 949 P.2d 746, 758 (Utah Ct. App. 1997) (adopting from state administrative proceedings the "substantial evidence" standard for determining whether a municipal civil service commission's findings are supported); *see also Thomas v. Draper City*, 2006 UT App 287U, para. 2 (mem.) (applying same standard for reviewing factual findings of a municipal appeal board). Substantial evidence "is that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *Lucas*, 949 P.2d at 758 (internal quotation marks omitted). The city's decision to impose consequences for employee misconduct is also a matter of discretion. *See id.*; *see also Thomas*, 2006 UT App 287U, para. 6. "'In determining whether the sanction of dismissal is warranted in this case, the [Board] must affirm the sanction if it is (1) appropriate to the offense and (2) consistent with previous sanctions imposed by the [City].'" *Thomas*, 2006 UT App 287U, para. 6 (alterations in original) (quoting *Ogden City Corp. v. Harmon*, 2005 UT App 274, ¶ 16, 116 P.3d 973).

¶3     Sunset City terminated Becker for "reporting for duty on April 1, 2007, with a Blood Alcohol Content of .045 in violation of Sunset Police Department Policy and Procedure Manual section[s] 3-03-02.0[0-.02], 1-01-04.00 and Sunset City Policy Manual section 4.2.4(D)." On April 1, 2007, Becker was assigned to work a "short back," meaning he had finished his previous shift as a patrol officer at 6:00 a.m. and was to return to work at 2:00 p.m. that same day following an eight-hour break. When Becker returned to work, his supervisor, Sergeant Bruce Arbogast, who had filled the interim shift, immediately detected a strong odor of alcohol emanating from Becker. Becker admitted to having "two stiff drinks," with about two-and-a-half shots of liquor in each, prior to going to bed between 8:00 and 9:00 a.m. that morning. Sergeant Arbogast then requested that Becker take a PBT. Becker consented, grabbing his own PBT from his

_____

[1]Any amendments to the relevant statutes do not affect our analysis, and we therefore cite to the current codification of the Utah Code for the reader's convenience.

patrol car and self-administering the test, which registered a blood alcohol content (BAC) of 0.045.[2]

¶4 Shortly thereafter, Utah Highway Patrol Trooper Michelle McLaughlin and Senior Trooper Arlow Hancock arrived at the police department for the unrelated purpose of resetting the clock on an intoxilyzer machine maintained on site. Senior Trooper Hancock was expecting to receive a new patrol car that was the same model as the one Becker was driving.[3] Accordingly, he and Trooper McLaughlin approached Becker to inquire about how he liked the vehicle. Senior Trooper Hancock immediately noticed the smell of alcohol coming from inside Becker's vehicle. He reported that Becker turned his head away whenever he spoke to the troopers, a behavior that Senior Trooper Hancock found "unusual." Becker was also eating mints and applying a "generous" amount of alcohol-based sanitizer to his hands, behaviors that Senior Trooper Hancock believed were intended to mask the odor of alcohol. Because Senior Trooper Hancock was concerned about Becker's ability to operate the vehicle and to perform his job safely, as well as the negative image an on-duty officer who had been drinking might present to the public, he asked Trooper McLaughlin whether she had noticed the alcohol odor. Trooper McLaughlin confirmed that she had and that she was likewise concerned about Becker's ability to perform his job safely.[4] Senior Trooper Hancock then reported the incident to Sergeant Arbogast. After consulting with Chief of Police Kent Eborn, Sergeant Arbogast relieved Becker from duty. Becker reported the next day for a disciplinary meeting and was terminated, effective April 4, 2007.

---

[2]Breath alcohol tests "measure a person's blood alcohol content from a sample of the person's breath." *Black's Law Dictionary* 215 (9th ed. 2009) (defining "breathalyzer"); *accord id.* at 899 (directing reader to the definition for "breathalyzer" for definition of "intoxilyzer").

[3]By stipulation of the parties, Senior Trooper Hancock's explanation of the day's events was presented to the Board through a written report.

[4]Trooper McLaughlin's testimony about Becker's behavior was consistent with Senior Trooper Hancock's explanation. Trooper McLaughlin, however, was privy to only part of the interaction; at some point, she entered the building to reset the clock on the intoxilyzer machine.

¶5      Becker appealed the termination, and the Board scheduled a hearing for April 16, 2007. *See Becker v. Sunset City*, 2009 UT App 197, ¶ 3, 216 P.3d 367. Due to an issue with the delivery of the notice of hearing, Becker was unable to obtain counsel and consequently represented himself at the hearing before the Board. *See id.* Following the April 16 hearing, the Board upheld Becker's termination. *See id.* ¶ 4. Becker sought judicial review of that decision citing a violation of his due process rights to notice and meaningful representation of counsel. *See id.* ¶ 5. This court agreed, setting aside the Board's decision and directing the Board to provide Becker with a new hearing at which he would be represented by an attorney. *See id.* ¶ 1. It is from the second hearing, held in December 2009, that Becker now seeks judicial review.

¶6      Becker admits that he "showed up for work [on April 1, 2007,] with some alcohol in [his] system" but contests the determination that he was "under the influence," in violation of the police department policy that prohibits "report[ing] for duty while under the influence of intoxicants," Sunset City Police Department Policy and Procedure Manual § 3-03-02.01. Sunset City's personnel policies and procedures manual defines

> [u]nder the [i]nfluence . . . [as] when an employee is affected by a drug or alcohol or the combination of drugs and alcohol to the extent that it affect[s] his or her ability to perform [his or her] job in a safe manner. An employee . . . , whose test detects a Blood Alcohol Content (BAC) of 0.04 or greater, shall be deemed under the influence.

Sunset City Personnel Policies and Procedures Manual § 14.7.1(h) (emphasis omitted). Coming to work "under the influence of alcohol" is a third level offense, which "usually lead[s] to termination," even for a first offense. *Id.* § 4.2.4 (d)(1), (e)(3).

¶7      According to Becker, the city could prove that he was "under the influence" only by means of the PBT results, which he claims were inadmissible because PBTs have not been certified as evidentiary devices, there was insufficient foundation on the reliability of the particular PBT used, and the city failed to follow its internal policy for drug and alcohol testing. In municipal administrative proceedings, the tribunal is not subject to the Utah Administrative Procedures Act or the Utah Rules of Evidence. *See Lucas*, 949

P.2d at 755-56 (citing *Tolman v. Salt Lake Cnty. Attorney*, 818 P.2d 23, 26 n.3 (Utah 1991)). Rather, the tribunal "must determine what evidence should, in fairness, be admitted." *Id.* at 756 (internal quotation marks omitted). Admitted "evidence must be legally relevant," meaning that it has "some probative weight and reliability." *Id.* (internal quotation marks omitted). We review a determination of whether evidence is legally relevant as a question of law for correctness. *See id.*

¶8    The probative value of evidence is "judged by the strength of the evidence and its ability to make the existence of a consequential fact either more or less probable and the proponent's need for the evidence." *State v. Downs*, 2008 UT App 247, ¶ 8, 190 P.3d 17 (internal quotation marks omitted). Because of the obvious relevance of the PBT results to the termination decision in this case, the probative weight of that evidence depends on the reliability of those results. Becker contends that, without expert testimony, there was an inadequate foundation to show that the PBT used was accurate and that its results therefore provided an insufficient basis for his termination. Trooper McLaughlin, however, testified that she had received training on PBTs as part of her education to calibrate and certify intoxilyzers, an area of breath testing in which Trooper McLaughlin is in fact an expert.[5] According to the trooper, a PBT is a reliable instrument because it produces BAC readings within a couple of thousandths of the BAC results registered on a fully-certified intoxilyzer machine.[6] She further testified that the primary reason that the results from an intoxilyzer device are admissible, while those from a PBT are not, is not due to issues with reliability. Rather, the PBT results are not admitted because a PBT does not create a printout with the BAC measurement, which makes it difficult to prove the reading at some later point--a circumstance that is not at issue here, as Becker acknowledges that the PBT registered 0.045 when he blew into it--and because a PBT is not recalibrated on a regular schedule. *See generally State v. Fischer*, 778 N.W.2d 629, 642 (Wis. 2010) ("Saying that PBT results are not admissible is not the same thing as saying they are not reliable."). Trooper McLaughlin further testified that because of her knowledge and experience, she had been designated to

---

[5]Defense counsel conceded Trooper McLaughlin's expertise on intoxilyzers.

[6]Sergeant Arbogast independently recalled that, in his experience, PBT readings had proved to be within thousandths of the BAC results produced by a subsequently-administered intoxilyzer test.

calibrate the PBT devices for the Sunset City Police Department on an as-needed basis, that is, whenever an officer expressed concern about a particular device's accuracy.

¶9     In addition to Trooper McLaughlin's testimony that PBT readings are generally reliable, there was additional evidence before the Board that supported the reliability of these PBT results. Becker himself told Sergeant Arbogast that he wanted to use his own city-issued PBT to perform the test the sergeant had requested because "'[he] kn[e]w [his] [wa]s pretty accurate.'" Moreover, Becker took the PBT home with him once relieved from duty and continued to rely on it to report back to the sergeant that his BAC readings had decreased to a level where he believed he was fit to come back to work. The next day, when he reported for disciplinary proceedings, Becker reiterated that his PBT was "fairly accurate." This characterization is corroborated by Becker's testimony that he had never expressed any concerns with this particular PBT or requested that it be recalibrated. In addition, the PBT was taken out of service by April 5, 2007, about four days after the incident, and placed under lock and key. Subsequent testing of the device on May 24, 2007, April 29, 2009, and December 9, 2009, showed the PBT to be producing accurate readings, further undercutting Becker's subsequent claim that this PBT was inaccurate. *See generally State v. Manwaring*, 2011 UT App 443, ¶ 28, 268 P.3d 201 (discrediting the defendant's claim that a PBT was unreliable where the facts of the case suggested that it was reliable). Thus the PBT results were sufficiently reliable to be "legally relevant" in the termination proceeding. *See Lucas v. Murray City Civil Serv. Comm'n*, 949 P.2d 746, 756 (Utah Ct. App. 1997).

¶10     We are also unpersuaded by Becker's claim that the PBT results should have been excluded from the proceedings before the Board because a separate administrative body--the Department of Workforce Services--concluded that the PBT results were not sufficiently reliable to be admissible for purposes of determining Becker's eligibility for unemployment benefits. The Department of Workforce Services' decision, however, did not exclude the PBT results on the basis that such results are inadmissible in administrative proceedings but, rather, acknowledged that "it is up to the . . . administrative law judge . . . to determine if the results from a particular testing device . . . are admissible." The Department of Workforce Services was concerned with the lack of evidence before it regarding the reliability of the particular PBT used to test Becker's level of intoxication. It noted Becker's testimony at the unemployment benefits hearing that he had reported problems with this particular PBT to his supervisor prior to the events of April 1, something he did not testify to in the termination proceeding.

The sole witness for Sunset City, Chief Eborn, had then failed to adequately dispel those concerns with evidence of the device's accuracy. That lack of foundation evidence, in conjunction with the fact that PBTs are not certified for use by the Department of Public Safety to measure the blood alcohol level of motor vehicle operators, caused the Department of Workforce Services to determine that the PBT results were not sufficiently reliable to be admissible in Becker's unemployment compensation proceeding.[7] The department, however, did not conclude that PBTs were never reliable

---

[7]The Department of Workforce Services' decision relied on various motor vehicle code requirements calling for blood alcohol testing using breath tests to be done on certified instruments if the results are to be used for evidentiary purposes. *See generally* Utah Code Ann. § 41-6a-515 (Supp. 2005) (current version at *id.* (2010)) (directing the department of public safety to establish chemical breath testing standards for results that are to be used "to prove that a person was operating or in actual physical control of a vehicle while under the influence" or "operating with a blood or breath alcohol content statutorily prohibited" and implementing a presumption of reliability if the standards have been met); Utah Admin. Code R714-500-4(A) (2007) (requiring that "[a]ll breath alcohol testing instruments employed by Utah law enforcement officers, to be used for evidentiary purposes [in cases involving alleged driving under the influence], . . . be approved by the department"); Utah Admin. Code R714-500-5(D)(2)-(3) (stating that for the results of a breath machine to be certified, the operator must, among other things, complete and retain "[p]rinted checklists" as well as retain "[t]est record cards" and the machine must be certified "on a routine basis, not to exceed 40 days between calibration tests").

Becker has not engaged in sufficient analysis to warrant our consideration of whether those requirements apply in cases, such as this, that do not involve driving a motor vehicle while under the influence of alcohol. Rather, Becker simply cited the principles of res judicata as the reason we should adopt the evidentiary ruling of the Department of Workforce Services for the city proceedings. When Sunset City countered that an evidentiary ruling in an unemployment insurance proceeding was not determinative of the PBT's admissibility in a municipal proceeding because the entities operate under different evidentiary standards, Becker failed to respond. This issue is therefore inadequately briefed, and we need not consider it. *See generally* Utah R. App. P. 24(a)(9) (stating that briefing must contain reasoned analysis based upon

(continued...)

or that they were universally inadmissible in administrative proceedings. *Cf. Motor Vehicle Admin. v. Weller*, 887 A.2d 1042, 1052-54 (Md. 2005) (determining that PBT results are admissible in administrative hearings despite the implied consent law's statement that such results are intended as a guide for police officers in making an arrest because the statute only precluded their use as evidence in court actions and civil actions); *State v. Doerr*, 599 N.W.2d 897, 900-01 (Wis. Ct. App. 1999) (observing that Wisconsin's statutory "bar on the evidentiary use of PBT results is limited to motor vehicle violations" and stating that the results are admissible as evidence of intoxication in cases involving non-vehicular violations if the prosecutors presented evidence of the device's accuracy and reliability). Indeed, the concerns that caused the Department of Workforce Services to exclude the PBT from consideration were either nonexistent in the city proceedings because Becker did not testify to any particular problems with his PBT or were adequately addressed through testimony regarding the reliability of PBTs generally and the accuracy of this particular device.

¶11    Finally, we consider the merits of Becker's claim that Sunset City's failure to obtain a urinalysis "resulted in a substantial violation" of his due process rights. The Utah Legislature has mandated that "[t]esting . . . for the presence of drug or alcohol by an employer . . . be carried out within the terms of a written policy which has been distributed to employees." Utah Code Ann. § 34-38-7(1) (2011); *see also Lucas*, 949 P.2d at 754 ("In disciplinary proceedings, a public body must comply with its own rules and an employee being disciplined is entitled to rely upon those rules." (internal quotation marks omitted)). The Board recognized that Sunset City's written policy requires analysis of a urine specimen when conducting drug or alcohol testing, *see* Sunset City Personnel Policies and Procedures Manual § 14.7.1(c), but found that "[i]t was not practical, reasonable or required under these circumstances to obtain a urine sample" because "[d]oing so would have taken an undetermined amount of time and would have left the City without police coverage."

¶12    Sunset City's written policy provides the city with the option of departing from the specified procedures when justified by the circumstances: "The procedures set out below are as complete as Sunset City can reasonably make them. However, they are not

---

[7](...continued)
relevant legal authority).

necessarily all inclusive.  Sunset City Corporation may vary from the rules/procedures listed if, in its opinion, the circumstances require." *Id.* § 4.3.2(a). Becker does not contest that this provision permits Sunset City, in appropriate situations, to employ a testing method different than the one prescribed but instead asserts that "there was no testimony or evidence offered to establish unusual circumstances that would not exist every time a urine test was requested."  Contrary to Becker's position, however, there was substantial evidence to support the Board's determination that "[i]t was not practical, reasonable or required" that a urinalysis be done in this instance.  Sergeant Arbogast and Chief Eborn both testified that Sergeant Arbogast was the only officer on duty at the time that Becker reported for his shift and that the sergeant had to cover the shift until arrangements could be made to call in an off-duty officer to take over, a task that was complicated by the small size of the Sunset City police force, which employed only eight officers.  In addition, Chief Eborn countered Becker's suggestion on cross-examination that the urinalysis would have required minimal time because it only took a few minutes to get to the hospital with concerns about how long the process could have taken once they reached the hospital. According to the chief, it would not have been practical to have the only officer on duty unavailable and the city without police services for an indeterminate amount of time.[8] The Board therefore did not abuse its

---

[8]Becker further contends that the intoxilyzer would have been a more reasonable choice for alternative testing because it has been deemed admissible for evidentiary purposes.  Testing Becker with the intoxilyzer perhaps may have avoided some of the reliability questions presented here, but at the time the events were unfolding, Sergeant Arbogast was unaware of Senior Trooper Hancock's and Trooper McLaughlin's intentions with regard to the machine.  Although he did not ask, he assumed, albeit incorrectly, that the intoxilyzer needed maintenance and therefore was not operational. While the intoxilyzer has evidentiary advantages, city policy did not specify alternatives to a urine test, and if that test was not practicable under the circumstances, Sunset City was not required to choose one alternative testing method over the other, so long as the chosen method was shown to be sufficiently reliable.  As we have discussed, the PBT used by Sunset City was shown to be sufficiently reliable, and the fact that an arguably better alternative might have been available does not mandate its use.

discretion in determining that "[i]t was not practical, reasonable or required under these circumstances to obtain a urine sample."[9]

¶13    On the facts of this case, we are convinced that the PBT results were shown to be sufficiently reliable to be admissible for purposes of this administrative proceeding. We caution, however, that our decision here is not a holding that PBT results are universally admissible in municipal proceedings or in any other context. *Cf. State v. Charan*, 971 P.2d 1165, 1167 (Idaho Ct. App. 1998) (limiting admissibility of intoxilyzer results obtained following an administration of the test without the mandatory observation period to the facts of the case). Rather, it is Trooper McLaughlin's uncontroverted testimony[10] that provided a sufficient foundation for admission of the PBT results here, especially in light of the subsequent testing that found this particular instrument to be accurate. The PBT reading of 0.045 meets the presumption established by Sunset City that a "[a]n employee . . . whose test detects a Blood Alcohol Content (BAC) of 0.04 or greater[] shall be deemed *under the influence*." Sunset City Personnel Policies and Procedures § 14.7.1(h). Because we have determined that the PBT evidence was admissible under the circumstances, the Board's determination that Becker was under the influence is supported by substantial evidence.

---

[9]Becker also raises a procedural due process claim, in which he challenges the independent research performed by one of the Board members on the admissibility of PBT results. Becker does not assert how this research affected his due process rights or explain how the activity prejudiced him. Consequently, the issue is inadequately briefed, and we do not consider it further. *See generally* Utah R. App. P. 24(a)(9) (requiring an appellant to provide a reasoned analysis along with citation to relevant legal authority).

[10]Becker attempted to challenge Trooper McLaughlin's testimony with cross-examination about the effects of hand sanitizer, either from Becker's hands or from storage of hand sanitizer with the PBT, on the blood alcohol reading. Such efforts, however, are directed toward raising questions about the weight of the trooper's testimony, efforts that the Board did not find convincing. The weight to be accorded to each witness's testimony is left to the finder of fact, and we will not substitute our judgment for the Board's. *See Iacono v. Hicken*, 2011 UT App 377, ¶ 17, 265 P.3d 116.

¶14　Finally, we deal with Becker's contention that termination was a disproportionate punishment for his conduct. Specifically, Becker points to the fact that his conduct resulted only in a "letter of caution," rather than decertification, from the Peace Officer Standards and Training Department (POST), the state agency responsible for certifying and disciplining police officers. Becker does not, however, take issue with Sunset City's position that while POST establishes minimum requirements for police officer conduct, an individual department may set higher standards for its officers. According to Sunset City Police Department policy, unless authorized by Chief Eborn, "use [of] alcoholic beverages or drugs that could inhibit performance or perception while on duty" and "report[ing] for duty while under the influence of intoxicants" are prohibited. Sunset City Police Department Policy and Procedures Manual § 3-03-02.01. We have concluded that there was substantial evidence to support the Board's determination that Becker was under the influence of alcohol when he reported to work on April 1, 2007. Reporting to work while under the influence is a third level offense for which city policy permits "discharge after the first offense." Sunset City Personnel Policies and Procedures Manual § 4.2.4(d)(1). The Board's decision to terminate was therefore not disproportionate to Becker's level of conduct, notwithstanding POST's decision to discipline, rather than decertify, him.

¶15　For the foregoing reasons, we decline to disturb the Board's decision.

_____
Stephen L. Roth, Judge

-----

¶16　WE CONCUR:

_____
J. Frederic Voros Jr.,
Associate Presiding Judge

_____
William A. Thorne Jr., Judge